```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2

 3   UNITED STATES OF AMERICA,)   Case No.
                              )   08-80134-CR-RYSKAMP
 4            Plaintiff,      )   09-80041-CR-RYSKAMP
                              )
 5       -v-                  )
                              )
 6   LINDA CASTRE GOSMAN,     )
                              )
 7            Defendant.      )   West Palm Beach, Florida
                              )   September 17, 2009
 8   _____)   8:36 a.m.

 9

10                         PAGES 1 - 123

11          TRANSCRIPT OF SENTENCING PROCEEDINGS

12       BEFORE THE HONORABLE KENNETH L. RYSKAMP

13                    U.S. DISTRICT JUDGE

14

15   Appearances:

16

     For the Government:        CAROLYN BELL
17                              LYNN ROSENTHAL
                                Assistant United States Attorneys
18                              500 Australian Avenue, Suite 400
                                West Palm Beach, Florida  33401
19
     For the Defendant:         BIERMAN SHOHAT LOEWY & KEGERREIS
20                              BY:  DONALD BIERMAN, ESQ.
                                BY:  ED SHOHAT, ESQ.
21                              BY:  IRA LOEWY, ESQ.
                                800 Brickell Avenue, Penthouse 2
22                              Miami, Florida  33131

23
     Reporter:                  Karl Shires, RPR
24   (561) 514-3728             Official Court Reporter
                                701 Clematis Street, Suite 258
25                              West Palm Beach, Florida  33401
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
1            THE COURT:  You may be seated.  Good morning.

2            The first matter is United States versus Gosman;

3    continuation of the hearing we had in July.

4            We took the testimony of Dr. Alexander, I believe

5    his name was, and Attorney LaSorte and heard some argument,

6    and we ran out of time.  So we'll pick up from there.

7            Counsel state their appearances, please.

8            MS. BELL:  Good morning, your Honor.  Assistant

9    United States Attorney Carolyn Bell and Assistant United

10   States Attorney Lynn Rosenthal on behalf of the United

11   States.  With us at counsel table are Internal Revenue

12   Special Agent Suzanne Kalwara and FBI Special Agent Paul

13   Wackes.

14           MS. ROSENTHAL:  Good morning.

15           MR. BIERMAN:  Good morning, your Honor.  Donald

16   Bierman, Ed Shohat, Ira Loewy on behalf of Lin Gosman who is

17   present in the courtroom.

18           THE COURT:  All right.  Thank you.  You may

19   proceed.  I don't know who's going first here but --

20           MS. BELL:  Well, your Honor, I believe that I was

21   in the middle of my presentation.

22           THE COURT:  All right.

23           MS. BELL:  I understand from Mr. Bierman that he

24   has another witness to call.  So my suggestion would be that

25   I finish my presentation, then he call his witness and make
```

1   his arguments, and then I'll make my arguments, and then

2   Mrs. Gosman can allocute.

3            THE COURT:  All right.  Very good.

4            MR. BIERMAN:  Might I, your Honor, with the Court's

5   permission summarize the last hearing or has the Court had

6   occasion to see --

7            THE COURT:  If you can do it in about five minutes.

8            MR. BIERMAN:  I could.

9            THE COURT:  I think I have a pretty good memory of

10  it.

11           MR. BIERMAN:  I think it would save time if I went

12  through it just very quickly.

13           THE COURT:  I have some notes on it.

14           MS. BELL:  Well, your Honor, if I may, I think that

15  in the course of my presentation a lot of what was discussed

16  will also be reviewed.

17           THE COURT:  Well, I think the defendant has more at

18  stake here than the Government.  I'll defer to the defendant.

19           MS. BELL:  Okay.

20           MR. BIERMAN:  Thank you, your Honor.

21           The hearing began and initially at Page 2 the

22  Government took no position on restitution.  The Court

23  commented at Page 3 that the Government looks like they're

24  acting for the trustee.  The Court ruled at Page 4 that there

25  would be no restitution.

1          Next was the testimony of Al LaSorte.  He said that

2     the missing items were grossly overstated.  There were

3     supposedly 41 of 235 items that Mrs. Gosman allegedly had not

4     turned over, and it turned out to be two items.  Multiple

5     parts of those two items, but two items.  And that's at

6     Page 14.

7          The trustee -- warehouse problems were pointed out

8     where they went to the trustee's warehouse and they

9     immediately found several of the items as soon as they were

10    let in.  The trustee then restrict -- got the Court to

11    restrict their assets and had them wait in a waiting room.

12    Even though they were initially told they could video the

13    contents of the warehouse, they were told to simply sit in

14    the waiting room and ask the people to bring out the items.

15    And, of course, the people in the warehouse didn't know what

16    items they had.

17         At Page 18 Claire Pierce, the trustee's contracted

18    labor, said she had no experience in antiques and art works.

19         Page 19, Mr. LaSorte pointed out this was the most

20    contentious litigation he had ever seen and that there were

21    pending a large number of appeals, but he was unable -- that

22    the Gosmans were unable to post $6 million in bond and had

23    asked for a stay which was denied.  He said that the affects

24    on Lin Gosman were palpable because she was called a liar,

25    thief, and contemptor at every hearing.  The Government asked

1    in cross was that the Court calling her that, and his

2    response was, no, that was the attorney for the trustee.

3            The Schedule A, they pointed out the values were

4    overstated, and the entire judgment was a result of a -- of

5    her being a non-wife.  And the Court points out that the

6    settlement provides that each side pay their own attorneys'

7    fees.

8            At Page 36 he testified that the judgment settled

9    with money to the Gosmans and the $66 million judgment was

10   ruled satisfied.  And they were -- at the time of the

11   settlement everyone was aware that this case had been

12   referred to the US Attorney's Office.

13           I proffered the testimony of Mrs. Alpert about the

14   marriage and that it had been long in existence well before

15   the bankruptcy, the wedding took place -- excuse me, your

16   Honor.  I have a bad infection.  That this wedding took

17   place, a public wedding, in 1996, well before the bankruptcy.

18           Mr. Gosman made his statement about the two faces

19   of Lin Gosman; the type of person she was before the trauma

20   of this bankruptcy, the panic and collapse after their house

21   was taken away, their marriage was taken away, her personal

22   goods were taken away.

23           Dr. Alexander testified, number one, at Page 47, 48

24   that he was engaged because at the Government's request at

25   the bond hearing that she receive psychiatric care.  He said

 1    that the affect of the marriage being broken was traumatic,

 2    the taking of the house added to that, and being called a

 3    liar and a thief gave her a loss of a sense of security and

 4    made her entire life appear as a fraud.  She was stripped of

 5    her integrity, at Page 51.  In addition, he pointed out the

 6    humiliation of her husband also was a traumatic event for

 7    her.  That's at Page 52.  He said that -- on cross he

 8    responded that her fear of prison was greater than the

 9    average person and that many people had, in fact, abandoned

10    her.

11            And I made an initial statement which I won't

12    repeat here.  And as the Court pointed out at Page 81, 82,

13    the invalidity of the marriage is crucial.  That matter was

14    never settled on appeal because of the settlement.

15            And at the end of the hearing, at Page 95, the

16    Government said they had 15 minutes more to present.  I don't

17    know if that 15 minutes is still going to be real or not.  I

18    certainly hope so.

19            THE COURT:  All right.  Thank you.

20            MS. BELL:  Your Honor, just to clarify a few things

21    that Mr. Bierman said.  First of all, the Court did not say

22    that there would be no restitution ordered.  The Court's

23    order was that restitution would be decided later.

24            Second of all, with respect to Mr. LaSorte, it was

25    also pointed out in his testimony that the items that he was

```
 1    talking about had nothing to do with the items that were the

 2    subject of the criminal charges.

 3          THE COURT:  Let me stop you there.  I did say there

 4    would be no restitution.  You said, well, they have a right

 5    to be heard.  I'll hear from them because they have a right

 6    to talk about sentencing, but the probation office clearly

 7    said there's a settlement.  I've read the settlement.  And

 8    you refused to even argue the settlement which indicates to

 9    me that you don't want to be put in the position of having to

10    argue something that is so ridiculous on these facts.  So,

11    I've never seen a situation in 23 years where restitution was

12    an issue and the Government refused to take a position on it.

13          MS. BELL:  Well, your Honor, we are -- the

14    Government is in a position not right now to talk about

15    restitution.  We're prepared --

16          THE COURT:  You weren't then either.

17          MS. BELL:  We are -- I am happy to discuss

18    restitution with the Court after our presentation.  I think

19    that --

20          THE COURT:  Well, you didn't respond to any of the

21    memos.  Last time you said that's a matter for the trustee to

22    deal with.

23          MS. BELL:  That is correct, your Honor.

24          THE COURT:  And you refused to -- and I said what

25    is your position.  You refused to take a position.
```

```
 1              MS. BELL:  That is correct.

 2              THE COURT:  All right.

 3              MS. BELL:  Okay.  With respect to the items that

 4   Mr. Bierman was talking about, what he said -- when he talked

 5   about Mr. LaSorte's testimony, again, the items that

 6   Mr. LaSorte was talking about have nothing to do with the

 7   items that are at issue today for criminal purposes.

 8              And with respect to the judgment, I'll get to the

 9   judgment --

10              THE COURT:  What are you talking about items?  Are

11   you talking about personal property items or something or

12   issues?  I'm not sure I'm following you.

13              MS. BELL:  Okay.  Your Honor, the criminal case

14   against Mrs. Gosman involves her hiding assets that were

15   found in a storage unit.

16              THE COURT:  That's where she testified falsely on a

17   deposition.

18              MS. BELL:  And concealed the assets.  Yes, your

19   Honor.

20              THE COURT:  Okay.  And she's pled guilty to that.

21   Are we going to try this case all over again?

22              MS. BELL:  Absolutely not.

23              THE COURT:  Well, why are we even talking about it?

24   She's pled guilty to giving a false statement.

25              MS. BELL:  Because, your Honor, as part of 3553 and
```

1   as part of making sure that the Court is aware of the nature

2   and circumstances of the offense and of the history and

3   characteristics of the defendant I want to advise the Court

4   of what this is.

5           THE COURT:  You gave me this as you walked into the

6   hearing last time as though I'm going to digest this in an

7   hour and a half.  And I've now had time to read it all, and

8   I'm very familiar with the issues.  But she's pled guilty to

9   it.

10          MS. BELL:  I have no doubt your Honor is familiar

11  with the issues.  My intention last time and my intention

12  this time is to summarize for the Court the documents that

13  are in that book --

14          THE COURT:  All right.

15          MS. BELL:  -- and that's what I intend to do.

16          THE COURT:  Okay.

17          MS. BELL:  Now, last time when I was here what I

18  was talking about was the defendant's background and about

19  her history and characteristics and what led up to her

20  offense.  We talked about how --

21          Oh.  And, your Honor, before I begin, your Honor

22  does have this book of exhibits in front of you.  For

23  purposes of efficiency I would ask that we be allowed to

24  publish the exhibits on the computer as I move along so that

25  way we can all be literally looking on the same page.

```
 1              THE COURT:  Okay.
 2              MS. BELL:  So turning first to Exhibit 1, we talked
 3    about how she ran the Gosman estate, how she oversaw 11
 4    employees and a monthly budget of over $100,000.  We talked
 5    about how she was a real estate professional with her own
 6    firm.  We talked about how she was a meticulous,
 7    detail-oriented person especially with respect to her
 8    finances.
 9              Turning to Exhibit 5, No. 006 and 007, we showed
10    the Court a sampling of the kind of ledgers sheets she put
11    together for her tax accountants showing her expenses.  We
12    showed the Court how she kept receipts, including receipts
13    for a $7 cup of coffee.
14              We talked about how when she was married to
15    Mr. Gosman, he was one of the richest men in the world and
16    how she lived in one of the most fabulous ocean-front estates
17    in the world.  We talked about how she and Mr. Gosman both
18    knowing that their fortunes had taken a drastic change for
19    the worst started transferring assets to her, assets that the
20    bankruptcy court later found were fraudulently transferred.
21              Now, today what I want to talk specifically
22    about --
23              THE COURT:  Why haven't you charged Abe Gosman with
24    fraud then?
25              MS. BELL:  Well, your Honor, that's one of the
```

1    questions that I want to answer for the Court.  If I may,

2    your Honor --

3         THE COURT:  Certainly.

4         MS. BELL:  -- what I would like to do is first

5    explain what Mrs. Gosman did, and then I promise you I will

6    answer that question if I may.

7         I know that another question that the Court has has

8    to do with the marital order and this fraudulent transfer

9    order and the validity of these orders.

10        With respect to the 2003 marital order, looking at

11   the new exhibits that I presented, Exhibit 40, that order was

12   appealed to Judge Marra, to the district court.  Judge Marra

13   was extensively briefed on the issues relating to the marital

14   order.  He reviewed the factual basis of the bankruptcy court

15   that had been created.  And he was well aware of the

16   consequences of anything he did with respect to that order.

17        THE COURT:  I've read the judge's order on the

18   marital issue.

19        MS. BELL:  Okay.  And you read Judge Marra's order

20   as well?

21        THE COURT:  I did.  I just got it this morning.

22   But it didn't seem like he ruled on the merits.  He said --

23   it involved a stay and whether or not he would issue a stay.

24   He said they would be likely to prevail.  But I don't think

25   it was an affirmance on the merits as I read it.  He just

```
 1    said I deny the stay.

 2              MS. BELL:  He denied the stay because he did not

 3    believe that there was a substantial issue on appeal.

 4              THE COURT:  That's a different thing than ruling on

 5    the merits, but --

 6              MS. BELL:  Yes, but it was appealed.  And he

 7    understood the consequences of his not allowing a stay of

 8    that judgment.  And that judgment was later sent up to the

 9    Eleventh Circuit which found it did not have jurisdiction.

10              With respect to the 2005 order, now that order, of

11    course, is really the beginning of this criminal case.  With

12    respect to that order, that order too was appealed to Judge

13    Marra on the issue of whether or not to stay the posting of

14    the supersedeas bond, and there too Judge Marra denied the

15    appeal --

16              THE COURT:  Denied the stay.

17              MS. BELL:  Right, with respect to the stay.  And

18    the Eleventh Circuit again affirmed Judge Marra and

19    specifically said although -- we find that they've dismissed

20    the appeal on jurisdictional grounds.  In a footnote they

21    say, in the process of arriving at our jurisdictional

22    conclusion we note that we became convinced that there was no

23    abuse of discretion on the part of the district court.

24              So these orders were both considered by a district

25    court at the time and as well as the Eleventh Circuit, and
```

1  although not on the merits certainly the district court was

2  well aware of the consequences of what it was doing and had

3  been briefed on these issues.

4       Now, also, your Honor, I would venture to guess

5  that in just about every kind of litigation if an order

6  doesn't go someone's way, they feel that that order is unfair

7  or invalid or they have some other problem with the order.

8  But, of course, the way our system works, you don't get to

9  lie or perjure yourself or conceal assets just because you

10  don't like an order.  Whether you agree with the order or

11  not, an order of a federal court is an order of a federal

12  court and it is due the respect of an order of any federal

13  court, which brings us to this March 1st order.

14       Now, last time, turning to Exhibit 38, we went over

15  what Mrs. Gosman did immediately after the order.  We showed

16  how within ten days of this order being issued this real

17  estate professional went to her bank and manipulated the

18  system in order to commit mortgage fraud, in other to get

19  $350,000 of the equity of a home that she owed.  We showed

20  how she laundered that money, how she spent that money over

21  the course of the next month in what was clearly an attempt

22  to conceal the source of those funds both from the bankruptcy

23  people as well as from the bank.

24       At the same time that she was doing this on

25  April 10th of 2005, she opened a storage unit, a new storage

1    unit.   Turning to Exhibit 24.   She opened a storage unit at a

2    place called United Stor-All.   Now, you'll notice when she

3    opened the storage unit, one of the things that she was asked

4    for was the name of an emergency contact.   And she put down

5    the name of a friend of hers with a fake phone number.   She

6    also put down -- paid for this unit in cash.   Now,

7    significantly, your Honor, in the past when she had storage

8    units she always paid for those units by check or by credit

9    card.   On the 11th of April she moved to a larger unit, and

10   she paid cash yet again.

11              On April 25th, a few days later, turning to

12   Exhibit 18, she was asked about the storage units.   And at

13   that time she said, turning to 0366, do you have -- other

14   than that Jupiter Self Storage and the U and Me storage, what

15   other storage facilities do you have now?

16              There is an old storage facility, I believe it's

17   called Extra Space, that I've had for ten years.

18              Anything else?

19              No.

20              Other than Extra Space, U and Me, and Jupiter Self

21   Storage, you have no other storage facilities that you're

22   using now?

23              No.

24              Are there any remaining items at Jupiter Self

25   Storage after your visit?

1          No.

2          I would also add, your Honor, that she was asked a

3   number of other questions about all of these different

4   storage units, and she specifically called her Jupiter Self

5   Storage an old storage unit.

6          On April 27th, two days later, turning to

7   Exhibit 20, she went to Public Storage down on Okeechobee.

8   And at that time she got yet another storage unit.  This time

9   she put down as her address an address in New York.  Now,

10  this is an address that she had used in New York I believe

11  before she was married to Abe Gosman.  And the alternate name

12  and address -- she didn't put down one of her employees or a

13  friend or anyone else, she put down someone in Atlanta as an

14  alternate name and address.  But more importantly, she had

15  the storage unit or she attempted to have the storage unit

16  put into a nominee name, a name of Cord Development.

17         Now, Cord Development is not a company that is

18  registered or was registered at the time in Florida or New

19  York.  So this just appeared to be a nominee name that she

20  was attempting to use.  She once again paid for this unit in

21  cash, and she paid for it through June 1st of 2005.

22         Now, this is April 25th.  Time goes on through the

23  month of May.  The trustee is attempting to execute on the

24  judgment, and they are being unsuccessful.  They go to the

25  bankruptcy court.  Now, the bankruptcy court as a very last

1    resort has this tool called a break order.  Break orders are

2    highly unusual.  They're only used when a bankruptcy court

3    feels that someone has assets that they're hiding, that

4    they're not turning over, and it's only upon a showing of

5    something very extreme that a bankruptcy court is going to

6    issue a break order.

7              This bankruptcy court issued numerous break orders.

8    And sure enough, the trustee started going to the different

9    places that it knew about and started finding assets.  And

10   one of the things we talked about last time is how, for

11   example, they went to her Sea Steppes house, the house out of

12   which she had taken the equity, and they found it was

13   essentially being used by her as a storage unit.

14             June 7th there's another hearing at which she

15   testifies.  June 10th there's yet another deposition,

16   Exhibit 19.  And at this deposition she's asked again -- and

17   I should tell the Court there are pages and pages of detailed

18   questions about storage units, about furniture, about

19   artwork, about tapestries, about jewelry.  And she's very

20   specific and she says, no, I don't have any of those things.

21             And in particular she says -- 0447.  Other than the

22   storage facilities that we've discussed, do you have any

23   other storage facilities anywhere in the world that you rent?

24             Her lawyer says, for the record, we've discussed

25   Extra Space, U and Me, something like Jupiter Self Storage,

1    and the storage area in Atlanta.

2              The Witness:  That's all.

3              Are there any other storage facilities anywhere in

4    the world other than the ones we've mentioned that you use,

5    may not be rented in your name, but that you use?

6              No.

7              Her lawyer:  He's including any storage area you

8    may have with your husband as opposed to just you

9    individually.

10             Right, that you use.

11             Right.

12             We've covered them all?

13             Yes.

14             Well, the day after that deposition, on June 11th,

15   turning to Exhibit 22, she goes back to Extra Space, that

16   being one of the units she had disclosed, and over the course

17   of the next four days goes in and out of Extra Space seven

18   times.  By the time the trustee catches up to her there's

19   nothing left in the storage unit.

20             On the 18th of June she goes back to United

21   Stor-All.  This was the one unit that she hadn't disclosed

22   the first time.  Going back to Exhibit 24.  On the 18th of

23   June she again pays in cash for a storage -- for the same

24   storage unit through the end of September.

25             Now, within the next few days the trustee staff

starts doing its work and they send out letters to various

storage units and they learn for the first time about the

Public Storage unit that Mrs. Gosman had opened and they go

back to the bankruptcy court and they get yet another break

order.  And when they get the break order, what do they find?

Moving to Exhibit 21.  They find Ali Baba's cave.  Literally

filled to the brim with furniture which she said she did not

have, artwork which she said she did not have, tapestries

which she said she did not have.

Now, I'm going to digress from our chronology here

for a moment to talk a little bit about valuation.  For loss

purposes we have agreed that the loss of all of the items in

that storage unit are between 200 and $400,000.

Looking at these pictures, clearly there are other

ways of having valued this under which they would be worth

more.  For example, insurance value.  We know that there were

two items in that storage unit:  A Louie XIV period pair of

giltwood arm chairs with original tapestries which in 1999

the Gosman valued for insurance purposes at $84,712, and a

pair of continental neoclassical urns in polished gray

granite which they valued at the time for that purpose at

$12,850.  So two things for insurance purposes back in 1999

were valued at over $100,000.

Why did we agree to this number?  Well, you heard

some testimony about inventories.  When the trustee did

1   inventories, its purpose was not in taking inventories to

2   find out where everything came from or even necessarily for

3   immediate appraisal purposes.  So the evidence that we had,

4   that the Government had at that time for purposes of figuring

5   out what the value was of what was in the storage unit was

6   going to cause an issue.  And so taking the most

7   conservative, taking the most reasonable approach we agreed

8   to a value of between 200 and $400,000.

9           Now, also because she only pled guilty to a false

10  statement regarding the storage unit, we did not include --

11  and also because there were some legal issues relating to

12  whether they were actually bankruptcy estate assets at the

13  time, we didn't include the $350,000 from the house, we

14  didn't include the 300, $400,000 from the structuring that

15  we'll get to in a moment.  I tell the Court this because for

16  variance purposes in thinking about the reasonableness of a

17  sentence the Court should know that none of those things are

18  taken into account for loss purposes.  So in determining

19  whether a variance is appropriate, the Court -- I wanted to

20  make sure the Court was aware of those issues.

21          So on the same day that they execute this break

22  order at Public Storage they do get the break order at Extra

23  Space and, as I said, there was nothing in Extra Space,

24  Exhibit 23, by the time they got there.

25          Right after that the trustee moved to hold

1    Mrs. Gosman in contempt.  They held a hearing on the 25th.

2    And the reason that's important is because from that moment

3    forward Mrs. Gosman wasn't answering questions.

4         Shortly after that they sought additional break

5    orders.  On the 1st of July they got a break order for Villa

6    Jasmine.  Villa Jasmine is the condominium up at the Colony

7    Hotel that the Gosmans were actually living in.  And in the

8    safe at Villa Jasmine, Exhibit 25, they find a Tahitian pearl

9    necklace and a pair of diamond earrings.  These were both

10   appraised by Mrs. Gosman's appraiser.  One at $10,000 and one

11   at $4,000.

12        While we're talking about jewelry, again I'm going

13   to digress.  Looking at Exhibit 26, in 2003 Mrs. Gosman had

14   over $2 million in jewelry that had been insured.  The

15   jewelry --

16        THE COURT:  A lot of that stuff was transferred

17   long before the bankruptcy as gifts, right?  Why is all of

18   her personal items subject to the bankruptcy claim of her

19   husband?  I mean, this wasn't a fraudulent transfer.  Because

20   you have a $66 million judgment?  How did you get that

21   against her is -- you know, to me a lot of this is very

22   bizarre.

23        MS. BELL:  Well, your Honor --

24        THE COURT:  You start selling her clothes and her

25   shoes and everything else.  I've never heard of that in a

1    bankruptcy.

2              MS. BELL:  Absolutely.  It happens every day.

3              THE COURT:  They sell their clothes?

4              MS. BELL:  Absolutely, your Honor.  Absolutely.

5    They sell clothing.  Well, there is an exempt amount of

6    clothing.  Everybody gets to keep a certain amount of

7    clothing that's valued at a certain amount.  But the clothing

8    that we were talking about with respect to Mrs. Gosman --

9              THE COURT:  But she's not bankrupt.

10             MS. BELL:  Your Honor, she was subject to -- put

11   aside the 66 million.

12             THE COURT:  Are you saying that all of the purchase

13   of clothing was done to defraud creditors?

14             MS. BELL:  She had a money judgment against her,

15   your Honor.  The theory was -- well, again, your Honor, we go

16   back to she may not have liked this, she may not have agreed

17   with this, this Court may not have agreed with this, but

18   there was a valid money judgment against her.  She didn't get

19   to decide what she got to keep and what she didn't get to

20   keep.  That was not her decision.  That was a decision for

21   the Courts.

22             THE COURT:  But weren't many of these assets, some

23   of them, purchased by herself with her own money, some gifts

24   made long before the bankruptcy?  Why would all that be

25   subject to the creditors of her husband?

1          MS. BELL:  Well, as with any money judgment, your

2     Honor, up to the amount of the money judgment -- and again,

3     let's just focus on the amount of the supersedeas bond.

4          THE COURT:  The question is, how did they get a

5     money judgment against her for the same amount that they had

6     against her husband?

7          MS. BELL:  There was not a money judgment against

8     her husband.

9          THE COURT:  66 million?

10         MS. BELL:  There was not a money judgment against

11    her husband --

12         THE COURT:  Just against her?

13         MS. BELL:  -- because her husband had transferred

14    all of those assets to her.

15         THE COURT:  Well, but if it's transferred before

16    the three years or whatever cutoff period --

17         MS. BELL:  The bankruptcy court found that it was

18    not -- that it was fraudulently transferred.

19         THE COURT:  Because they weren't married?

20         MS. BELL:  No, actually, not because they weren't

21    married.

22         THE COURT:  What if they're just living together

23    and he made gifts to her?

24         MS. BELL:  Independently.  A fraudulent transfer,

25    your Honor, is a transfer made -- and again, I'm just going

1    very generally.  It's a transfer made for purposes of to

2    hinder and delay and defraud creditors.  The bankruptcy court

3    found that at the time these transfers were made to her --

4    the transfers we're talking about are transfers of money from

5    the sale of a Gulf Stream airplane.

6              THE COURT:  I'm not talking about those things.

7    I'm talking about clothes and jewelry.  She might have had

8    those clothes for ten years.  Who knows.

9              MS. BELL:  There was a money judgment.  In order to

10   get the money to pay that money judgment, the trustee was

11   entitled on behalf of the bankruptcy creditors to take

12   whatever they needed to in order to get that money, and that

13   happens every day.

14             THE COURT:  But before you get a money judgment

15   wouldn't you have to determine that all of that money

16   represented in that judgment represents things that were

17   transferred to avoid creditors?

18             MS. BELL:  That was done.

19             THE COURT:  Well, they found that a necklace was

20   done -- was transferred within the period of time?

21             MS. BELL:  Your Honor --

22             THE COURT:  It sounds to me like they just gave a

23   blanket judgment for everything --

24             MS. BELL:  That's correct.

25             THE COURT:  -- regardless of when it was

1    transferred.

2              MS. BELL:  That is correct.  It was a money

3    judgment.  The money judgment said --

4              THE COURT:  But I want to know why the money

5    judgment included assets that may have been transferred long

6    before, not in contemplation of any fraud of creditors.

7              MS. BELL:  The judgment itself -- the basis for the

8    judgment did not include those items.

9              THE COURT:  Of course, the --

10             MS. BELL:  In executing on the judgment the trustee

11   on behalf of the bankruptcy creditors -- I'm going to take a

12   moment, your Honor.  The bankruptcy creditors, they are the

13   victims here.  They were the victims of what Mr. Gosman did

14   and of what Mrs. Gosman did.

15             THE COURT:  Well, I heard she had substantial

16   assets in her own name long before they even got married.

17             MS. BELL:  She had some moneys that had been given

18   to her by Mr. Gosman pursuant to marital and antenuptial and

19   prenuptial things.

20             THE COURT:  Long before bankruptcy was in

21   contemplation.

22             MS. BELL:  Long before -- some moneys.  A few

23   millions dollars.  Like one or two million dollars.

24             THE COURT:  But all of that was subject to this

25   judgment, right?

1          MS. BELL:  Everything.  Whenever you have a

2     judgment against you.  Whenever you have a judgment against

3     you, your Honor.

4          THE COURT:  Now, that judgment was never reviewed

5     by any Court, right?

6          MS. BELL:  Yes, it was, your Honor.

7          THE COURT:  By what Court?

8          MS. BELL:  By Judge Marra.

9          THE COURT:  The money judgment?

10          MS. BELL:  For purposes of the supersedeas bond.

11     That was exactly the issue that was before him.

12          THE COURT:  That wasn't on the merits, of course.

13     That was just on a stay.

14          MS. BELL:  Your Honor, Judge Marra, I am sure, was

15     well aware that this motion regarding --

16          THE COURT:  Why are you so sure of that?  Were you

17     arguing it before him?  The trustee told you that he was

18     sure that --

19          MS. BELL:  No, your Honor.  I'm basing it on my

20     knowledge of Judge Marra's carefulness and deliberateness.

21          THE COURT:  All right.

22          MS. BELL:  What I was going to say was, I am sure

23     that he was well aware of the consequences of any order that

24     he issued with respect to that judgment.

25          THE COURT:  Well, I don't know why we're going into

1    all of this.  She's pled guilty to certain charges.  I know

2    what the charges are.  But you can continue with your

3    presentation.

4              MS. BELL:  Thank you, your Honor.

5              The jewelry that we're talking about, this $2

6    million in jewelry, it included her $1 million insured

7    engagement ring that was over 20 carats.  It included a

8    diamond and yellow sapphire necklace insured for $55,000,

9    diamond and emerald earnings insured for $100,000.  It

10   included a platinum ring set with emerald-cut Colombian

11   emeralds over 22 carats and diamonds insured for over

12   $240,000.  It included many valuable pieces of jewelry.

13             Now, as you might imagine the trustee, having a

14   money judgment and being perfectly within his rights on

15   behalf of the creditor victims to get whatever assets

16   Mrs. Gosman had in order to satisfy that money judgment,

17   wanted to know what happened to that jewelry.  And so the

18   first opportunity that the trustee had the trustee asked her

19   about this jewelry.  The first time they deposed her on

20   April 25th the first question that's asked:

21             Ms. Gosman, I understand that your husband gave you

22   an engagement ring of a fairly substantial size; is that

23   correct?

24             Yes.

25             Okay.

1          Several carats.

2          How many carats was that?

3          I think 20 carats.

4          Where is that ring now?

5          The ring was sold.

6          When was it sold?

7          To the best of my recollection, my memory, sometime

8   in the latter part of 2003.

9          To whom was it sold?

10         It was sold to a dealer in Israel.

11         Can you tell me that dealer's name?

12         His name is Yosi.  I can't remember what his last

13  name is.

14         Do you have any documentation relating to that

15  sale?

16         I don't at this point, no.

17         Who would have those documents?

18         I don't believe anyone --

19         MR. BIERMAN:  I'm going to object just in the

20  interest of time.  This is before the judgment.

21         THE COURT:  I've already read all of this.  It was

22  in the book.  I read all of this testimony.

23         MS. BELL:  If I may continue, your Honor?

24         THE COURT:  Certainly.

25         MS. BELL:  I don't believe anyone would have those

1    documents.

2           Did you ever have documents relating to the sale of

3    that ring?

4           He never gave me any documents regarding the sale.

5           So this Yosi, how much did he pay for that ring?

6           There were -- I don't remember, because it was a

7    number of things that he purchased from me.

8           What was the total amount for the number of things

9    that he purchased from you?

10          I think around seven or 800,000.

11          What were the other number of things that you sold

12   to him?

13          I sold some pearls to him and I think some emerald

14   pieces.  I can't really remember exactly everything because

15   so much has happened in my life.  I can't remember all of the

16   pieces.

17          But he gave you no paperwork in relation to that?

18          No.

19          Did he pay you by cash or by check?

20          By cash.

21          She then goes on to testify that she got about

22   three or $400,000 in cash from Yosi, but she doesn't remember

23   where she deposited it.  And the remainder she says she might

24   have deposited in a Swiss account or maybe United States

25   account at Northern Trust.

```
 1              Your Honor, nothing that we have seen from

 2   Mrs. Gosman relating to her bank states corroborates any of

 3   that.  Even looking at the bank statements that she did give

 4   us for -- from her foreign account, the first bank statement

 5   she gave us begins in January of 2004.  It talks about a bank

 6   transfer.  So there's nothing that corroborates that.

 7              At the June 7th hearing she's asked about this

 8   again.

 9              Isn't it also so that in late 2003 you traveled to

10   Israel?  Is that true?

11              That's correct.

12              And at the time you sold your 20 carat diamond ring

13   along with other jewelry to a gentleman named Yosi?

14              Yes.

15              What's Yosi's last name?

16              I don't know his last name.

17              What's the name of his business?

18              I don't know that either.

19              It's true that you have no documents about the

20   sale; is that right?

21              I do not.

22              And how much would you pay for that jewelry?

23              I believe it was around 700.

24              Could it have been as high as 800?

25              I believe it was around 700.
```

1        Part of that was wired into your Swiss bank

2    account; is that true?

3        Yes.

4        And part of that you received in cash?

5        Very little in cash.

6        Well, then she goes on to be cross-examined about

7    the inconsistencies between that and her prior testimony

8    about getting three or $400,000 in cash, and ultimately what

9    she says is that she got the money essentially in two phases,

10   at two separate times.

11       Three days later, at the June 10th deposition,

12   she's asked about it again.  This time she goes back to

13   saying it's seven or 800,000.  She's not sure.  And most of

14   it's wired to her Swiss account and she gets twenty or

15   $30,000 in money orders.

16       And in talking about the two phases, specifically

17   about the second page, looking at 0880, she says:

18       When was the next phase, that was the word you

19   used, a payment from the Israeli jeweler?

20       I don't remember.

21       Was it a few weeks later, a few months later?

22       It had to be months later.

23       Was there any contract or bill of sale or

24   promissory note related to the sale?

25       No.

1          So you took this guy's word for it that he was

2    going to pay you the remainder?

3          Yes.

4          Did you know this particular individual?  Did you

5    know him prior to the sale?

6          No.

7          How did you get introduced to him?

8          I just -- I found him.

9          How did you find him?

10         I went to Israel and I made some phone calls.

11         And his name was Yosi?

12         Yosi.

13         Do you remember his last name?

14         I do not.

15         Do you remember where in Israel he was, what city?

16         No.

17         Televiv, Jerusalem?

18         I don't know where he lived.

19         Where did you consummate the transaction?

20         In Jerusalem.

21         Your Honor, we interviewed some individuals, at the

22    time friends of Mrs. Gosman, who traveled with her to Israel

23    in late 2003.  They said that she told them that that was her

24    first trip to Israel.  They said that she stayed at their

25    apartment with them.  She didn't ask to use their safe.  They

1    never had any conversations with her about jewelry.

2              THE COURT:  Are you proffering this or --

3              MS. BELL:  Yes, I am proffering this.  This is the

4    one part of this I'm proffering.

5              THE COURT:  We don't even know who we're talking

6    about.  We haven't named anybody.  But you're just repeating

7    some testimony that you think impeaches her testimony, I

8    guess.

9              MS. BELL:  I'm proffering to the Court so that the

10   Court can rule on whether or not a variance is appropriate

11   here.  And I do think that her credibility with respect to

12   whether or not she still has this jewelry is an important

13   issue for the Court to consider.

14             They also commented, your Honor, she never had any

15   conversations with them about jewelry or about finding

16   jewelers in Israel, and that Lin Gosman doesn't speak Hebrew.

17             So we have -- putting aside their testimony, we

18   have a woman who saves a $7 coffee receipt, who has -- today,

19   according to the PSI, has an entire storage unit filled with

20   papers, who claims to have no documentation about selling

21   what she says is maybe seven or $800,000 in jewelry, she's

22   not sure of the amount, she's not sure of what was sold

23   except it included her, at the time insured for $1,000,000,

24   20 caret engagement ring.  She's given wildly diverse stories

25   about what happened to this, none of which are corroborated

```
 1    in any way by any documentation.

 2              With respect to her history and characteristics,

 3    with respect to the nature and circumstances of this offense,

 4    your Honor, this is all very pertinent.

 5              THE COURT:  Why would her engagement ring, long --

 6    20 years almost they're married.  Why would that be subject

 7    to the claims of creditors of her husband?

 8              MS. BELL:  Your Honor, the bankruptcy trustee on

 9    behalf of the creditors had a money judgment against her.

10              THE COURT:  You've got a money judgment against

11    her, but I would like to know what reasoning behind that.

12    Obviously, the trustee got whatever he wanted from the

13    bankruptcy court.

14              MS. BELL:  Actually, your Honor, the trustee did

15    not get whatever they wanted.  One of the things, for

16    example, they wanted was that Mrs. --

17              THE COURT:  To repatriate the money back.

18              MS. BELL:  That's right.

19              THE COURT:  But I'm talking about early in the -- I

20    think Judge Friedman finally put a stop to a lot of this when

21    he saw what was going on.  He refused to do it.  And

22    apparently the attorney said if we can get her indicted, she

23    will have to stay in jail because she's likely to flee

24    because she --

25              MS. BELL:  Your Honor --
```

```
 1              THE COURT:  And that's the way they got it
 2    repatriated, by indicting her.
 3              MS. BELL:  Your Honor, Judge Friedman was the one
 4    who made the initial referral of this case to the US
 5    Attorney's Office, not the trustee as I told the Court last
 6    time.
 7              THE COURT:  Well, the trustee told Judge Friedman
 8    to send it to the Court.  I've sent numerous things --
 9              MS. BELL:  Absolutely not, your Honor.
10              THE COURT:  I've sent numerous things to the US
11    Attorney's Office, and they never followed up on one of them.
12    So, Judge Friedman must have a lot more clout in the US
13    Attorney's Office.
14              MS. BELL:  Your Honor, it was the egregiousness of
15    this conduct that caused the US Attorney's Office to take
16    this case so seriously.  So it was not --
17              THE COURT:  And the publicity which this case has,
18    of course.
19              MS. BELL:  Well, to the extent that this case has
20    publicity --
21              THE COURT:  Let me tell you about the US Attorney's
22    Office.  In 23 years of doing this I have never seen one
23    perjury case filed by the US Attorney's Office, and I've
24    heard perjury every week virtually in criminal and civil
25    cases.  Never a single witness ever charged with perjury.
```

1      With regard to mortgage fraud, I've had one

2  mortgage fraud case by a guy who violated his -- a judge in

3  Fort Lauderdale, he violated his supervised release, and the

4  attorney there was so upset he filed a mortgage fraud.  But

5  what we know about mortgage fraud nowadays, there wouldn't be

6  enough prosecutors in this country to prosecute all of the

7  mortgage fraud that's gone on in the last few years.  And I

8  don't see any of it being filed.

9      And with regard to IRS, as far as I can see -- I've

10  had numerous defendants who haven't paid a dime in taxes.

11  Government hasn't filed one claim against them for not paying

12  the tax.

13      This wasn't a failure to pay taxes.  This is

14  failure to check a box where you didn't have an account.  And

15  now we know that there are over 5,000 people in this country

16  who have offshore accounts, and the Government is offering

17  amnesty if they'll just fess up because they know they could

18  never prosecute them.  Defense lawyers say there's a one

19  chance out of 20 that you could ever be -- you would ever

20  be -- so they're saying maybe you ought -- shouldn't fess up,

21  because there's only a 5 percent chance that they'll ever

22  reach you.

23      So these are cases I have never seen in 23 years.

24  And the US Attorney's Office is handling this like it's a

25  crime of the century.  I have never seen documentation like

1     this for a sentencing.

2          MS. BELL:  Well, your Honor, I have personally

3     prosecuted numerous mortgage fraud cases.  I've personally

4     prosecuted numerous perjury cases.

5          THE COURT:  But the mortgage company hasn't lost a

6     dime on this case, right?

7          MS. BELL:  Correct.

8          THE COURT:  Okay.

9          MS. BELL:  Correct.  And I've personally prosecuted

10    mortgage fraud cases where the mortgage company actually made

11    money.  So those kind of prosecutions have been happening and

12    are happening.

13         THE COURT:  They haven't fallen in my division.

14         MS. BELL:  Well, all I can tell you is that they

15    happen very frequently and the fact that our resources are

16    such that we can't prosecute every single one means that when

17    we do put the resources into prosecuting one, it is because

18    in the estimation of the US Attorney's Office the behavior is

19    that significant and that egregious as it was in this case.

20         Now, with respect to what happens next, on the 15th

21    of July Judge Friedman issues this order regarding the

22    repatriation.  And in the course of this order he says, the

23    last line of the order, he says that -- 0523 --

24         THE COURT:  I've read the order.

25         MS. BELL:  He says that she is to continue to not

1    dissipate.   Remains enjoined from dissipating, concealing, or

2    transferring any of her assets.

3             So what does she do?  She begins dissipating her

4    assets without the knowledge of Judge Friedman, the

5    bankruptcy court, or the bankruptcy trustee.

6             On the 19th of September she opens an account at

7    Eurobank.  By the way, doesn't use a Palm Beach County branch

8    bank.  Uses a Broward County branch bank.  And begins

9    depositing money and structuring it out.  She deposits money

10   from this oversees account and structures it out so that no

11   CTRs will be filed.

12            In the next year, the next summer, the bank tells

13   her that they're going to close the account because of

14   abnormal activity in the account, because of the structuring.

15   So then she goes and opens an account at Wachovia Bank where

16   she does the same thing.

17            This behavior continues without the knowledge of

18   the bankruptcy court, without the knowledge of the bankruptcy

19   trustee until the indictment of Mrs. Gosman.  They did not

20   know about this throughout this entire period of time.  They

21   did not know about this at the time that the settlement was

22   entered into.

23            In addition to this money that she's dissipating

24   through this account, she's also dissipating money through an

25   American Express card without the knowledge of the bankruptcy

1  court or the trustee.  What's she spending the money on?

2  She's shopping.  She's continuing to go to society functions.

3       Now, Mr. Gosman, when he was here last time, he

4  talked about the toll that this marital order and the

5  bankruptcy had taken on his wife.  But I would point out to

6  the Court that there are, in fact, numerous society page

7  pictures of Mrs. Gosman during the bankruptcy and even after

8  the bankruptcy.  And, in fact, looking at Exhibit 47, in

9  February of 2008 there's a picture of her and Mr. Gosman at a

10  society function.

11       She's also traveling during this bankruptcy;

12  France, Switzerland, Turkey, Egypt, Dubai, Jordan, Israel,

13  Indian, and throughout the United States.  Now, travel is

14  another issue I wanted to bring to the Court's attention for

15  purposes of determining whether a variance is appropriate.

16       After the bankruptcy is settled but when

17  Mrs. Gosman knows she's under criminal investigation, in May

18  of 2008 we see an American Express payment to something

19  called the Sovereign Society.  Page 1045.  What is the

20  Sovereign Society?  The Sovereign Society, according to its

21  website, is an institution -- a company that puts out a

22  newsletter about asset protection strategies.  Among the

23  things that it touts -- next page, please.  Keep going.

24  Never pay US taxes again legally, obscure tax havens of the

25  world.  It talks about -- at the Sovereign Society we

1    constantly refer to our top four financial havens:

2    Switzerland, Panama, Liechtenstein, and Hong Kong.   Thwart

3    the Government's attempts to spy on your finances.   This kind

4    of information goes on and on.   Our mission is to help you

5    achieve total wealth, the peace of mind that comes from

6    knowing your financial affairs are kept private, your assets

7    are fully and legally protected, and that you have unfettered

8    access to the world's top performing investments.   They give

9    information about getting a second identity, a second

10   passport.   They give information about making sure that your

11   money is unfettered from -- I think the language is

12   unfettered from discovery by lawyers and ex's and crooks and

13   things of that nature.

14          What places do we see Mrs. Gosman travel to after

15   the bankruptcy?   Morocco, Dubai, Singapore, Paris, Hong Kong,

16   and Panama.

17          The Court should know that in the bond hearing

18   Mrs. Gosman was asked about this, and her explanation was

19   that the reason she was visiting those countries is because

20   she was working on a children's book.

21          Now, March of 2007, that was an important month for

22   Mrs. Gosman because that was when the bankruptcy was settled.

23          Now there's been some suggestion that the reason

24   why Mr. Gosman got money from the bankruptcy, which he

25   ultimately gave to Mrs. Gosman, was because they didn't do

1    anything wrong.  The two issues are not at all related.

2    Mr. Gosman got money because he was due some money for a

3    Homestead exemption for his house.  That's it.

4          Now, there's also been a real attempt by

5    Mr. Bierman on Mrs. Gosman's behalf to vilify the trustee and

6    his counsel.  The trustee and his lawyers were not working

7    for Mrs. Gosman.  They were working for her victims, the

8    creditors.  The financial victims of her crime and the

9    creditors of Abe Gosman, who are they?  Who are these

10    creditors, these victims?  They are people, either

11    individually or through institutions, who either provided

12    services for which they were not paid or loaned money which

13    they were not repaid.

14         THE COURT:  You make this sound like a fraud case.

15    This is not Bernie Madoff.  I mean, if Mr. Gosman were

16    bigger, he would have gotten bailed out by the federal

17    government.  But he wasn't too big to fail.  General Motors,

18    Chrysler, AIG, many banks, they all went bankrupt.  Nobody is

19    alleging fraud and -- this is simply a bankruptcy, and the

20    law provides that people have protection in bankruptcy.

21    You're sounding like he did something like a ponzi scheme.

22         MS. BELL:  He did not do a ponzi scheme.  He is not

23    the one who's charged with a crime.  Mrs. Gosman is the one

24    who is charged with a crime.

25         THE COURT:  But the creditors of are of Mr. Gosman.

```
1              MS. BELL:  The creditors of are of Mr. Gosman.

2     When Mrs. Gosman was hiding her assets, was preventing the

3     trustee from being able to get money that the Court, a

4     federal court had said was rightfully theirs, they were her

5     victims.  That is why -- so when we talk about the trustee,

6     the trustee is working on behalf of the creditors who are

7     Mrs. Gosman's victims.

8              THE COURT:  They had an unlimited budget and they

9     overspent it, right?

10             MS. BELL:  I would beg to differ, your Honor.

11             THE COURT:  $25 million?

12             MS. BELL:  First of all, I don't know what the

13    amount is.  When I asked the trustee how much they said, and

14    I gave them that number because that's the number that I

15    heard, they laughed.  They said it's not even close to that.

16             Were they aggressive in going after Mrs. Gosman?

17    Absolutely.  That's what their clients, Mr. Gosman's

18    creditors wanted.  They wanted lawyers and trustees who were

19    going to be aggressive.  They actually elected this trustee

20    knowing that they wanted this -- knowing what kind of fees

21    they were going to be charged.  They were going to be

22    charged.  The estate is charged these fees.  It is not

23    Mrs. Gosman.  It's the estate, the creditors that end up

24    paying these fees.  It comes out of what they ultimately get.

25             Mrs. Gosman has to pay that money over whether it
```

1    goes to the trustee, whether it goes to this counsel, or

2    whether it goes to the creditors.  She's still has to pay

3    that money over.  She doesn't get to decide how much money

4    gets into that pot.  And she also doesn't get to decide where

5    it goes.

6           Were they aggressive?  Of course, because they knew

7    what kind of -- what had already happened.  They knew what

8    she had already tried do with respect to the fraudulent

9    transfers.  I submit, your Honor, they were not aggressive

10   enough.  They didn't find out about the $350,000 in equity

11   from the house.  They didn't find out about the structured

12   money.  They didn't find out about the American Express

13   bills.  They were not aggressive enough in the face of

14   Mrs. Gosman's criminal conduct.

15          Were their fees high?  Every dime that was paid to

16   the trustee, every dime that was paid to the lawyer, the

17   creditors, the people who hired them, their clients had the

18   opportunity to object to their fees.  Every dime was reviewed

19   and approved by the bankruptcy court.  They are not the

20   villains here.  They were doing what their clients wanted

21   them to do.  Their clients wanted them to be aggressive and

22   assertive in going after Mrs. Gosman, in going after what

23   they were owed.

24          Now, you asked me with respect to Mr. Gosman why he

25   wasn't charged.  The reason lies in the difference between

1    civil fraud and criminal fraud.  Civil fraud may be immoral,

2    may be -- people may do things that shock the conscience, but

3    it is open and notorious.  Abe Gosman transferred assets to

4    his wife in an attempt, in a fraudulent attempt to shield

5    them from his bankruptcy and to keep them from his creditors,

6    but he did it in the open.  Everybody knew about it.  He

7    challenged his creditors to come after him.  And after

8    millions of dollars spent by him in legal fees and millions

9    of dollars spent by the creditors who were owed this money in

10   legal fees, he lost.

11          What Mrs. Gosman did was criminal.  It was not open

12   and notorious.  It was secretive, deliberate, and dishonest.

13   It was a crime.  It was a crime that was in the context of

14   bankruptcy court in particular outrageous.  It is outrageous

15   to go in defiance -- to sit in a deposition and be asked

16   about assets and be asked about storage units and to lie,

17   just lie.  It is outrageous in the context of a bankruptcy to

18   rent storage units in nominee names and hide your assets in

19   there.

20          If we don't prosecute this kind of bankruptcy

21   fraud, your Honor, what kind of bankruptcy fraud should we be

22   prosecuting?  This is -- in the context of bankruptcy fraud

23   this is at the top of the heap.  This is the kind of

24   bankruptcy fraud that everyone who looks at it says, oh, my

25   goodness.  And that's why this case is being prosecuted by

 1   the US Attorney's Office.

 2          The fact that it's in a public case, the fact that

 3   it's in a case involving a lot of money, we have prosecuted

 4   cases involving much smaller amounts of money involving

 5   similar conduct.  Why?  Because it is the conduct that the

 6   bankruptcy system needs to know will be addressed.  And it is

 7   the conduct that if we do not address, the bankruptcy system

 8   won't work.

 9          Now, again, I told the Court that I was going to

10   save argument for later, but I --

11          THE COURT:  You also said last time you had 15

12   minutes and you've gone about 45.

13          MS. BELL:  Well, the good news is I'm done talking

14   about the bankruptcy fraud.  Now I'm just going to talk about

15   the tax fraud.

16          THE COURT:  That was included in the 15 minutes

17   also?

18          MS. BELL:  I got a new watch today, your Honor.

19   Perhaps I'll tell time a little better.

20          In March of 2007, just before the bankruptcy

21   settled, Mrs. Gosman finally files her 2004 tax return.  She

22   uses a very reputable Palm Beach firm, Rampell and Rampell,

23   to prepare this return.  Once again, being this

24   detail-oriented person she writes them a letter in January of

25   2007 very specifically saying what information they should be

1    looking at.  She never tells them about the foreign trust in

2    Belize that she set up in a nominee name in late 2003.  She

3    never tells them about the Swiss account that was opened.

4    She never tells them about how this was all hidden and how

5    she managed to structure the money from it in order to keep

6    the IRS from knowing about it.  She reports $15,000 in

7    income.  In January of 2004 she had $3.3 million in that

8    foreign account.

9         Now, we have no records to date of how much she

10   made in dividends and interest but -- the documents are

11   difficult to read.  But just thumbing through them you can

12   see numerous, I mean pages and pages of dividends, interest,

13   dividend, interest.  So we know that she made significant

14   dividends and interest.  She files this 2004 return.  She

15   never files 2005, 2006, 2007, 2008.  Even after indictment,

16   even after a guilty plea those returns are still not filed.

17        This is a separate harm.  This is a separate

18   victim.  It is incredibly egregious to have a multimillion

19   dollar foreign account earning interest and dividends that's

20   not being reported to the IRS.  This is not your garden

21   variety tax fraud, your Honor.  This is serious and

22   significant and separate in and of itself fraud that was

23   being committed by Mrs. Gosman.

24        Now, as I said, I do have argument, but at this

25   point in time in terms of the factual presentation --

```
 1              THE COURT:  What I heard wasn't argument?

 2              MS. BELL:  What you heard, your Honor, were facts.

 3    What you heard, your Honor, was what Mrs. Gosman did.  What

 4    she did was she committed -- a real estate professional

 5    committed mortgage fraud, got $350,000 from it.  Now, putting

 6    it in context, mortgage fraud, $350,000, that's a lot of

 7    money to get for purposes of a mortgage fraud.  Most of the

 8    mortgage fraud people that we're taking a look at now --

 9              THE COURT:  Do we have any statement that the

10    mortgage company wouldn't have loaned her the money --

11              MS. BELL:  Absolutely.

12              THE COURT:  -- if they knew about the judgment?

13    The judgment was in all of the papers.  Everybody knew what

14    was going on.

15              MS. BELL:  Absolutely, your Honor.  Absolutely.

16              THE COURT:  They haven't lost anything, right?

17              MS. BELL:  Not as of now.  They're still

18    collateralized.  But they, they -- the individual at the bank

19    who took the loan was interviewed and testified and was very

20    clear that he did not know.  And even if he did know --

21              THE COURT:  This was Washington Mutual --

22              MS. BELL:  Yes.

23              THE COURT:  -- who went broke because of all of the

24    bad loans they made.  They used to call those liars mortgages

25    because nobody cared what kind of money you had.  You looked
```

1    at the value of the property and you looked at the appraisal

2    and you looked at the loan and you said who cares whether

3    they've got -- the one case I had the guy was in jail and

4    said he was making 500,000 a year.  They could care less.

5    They just looked at the value of the property and the value

6    of the loan.

7              MS. BELL:  I would agree, your Honor, that mortgage

8    fraud was pretty much rampant.

9              THE COURT:  It wasn't fraud.  They didn't care.

10   The mortgage companies didn't care.

11             MS. BELL:  The fact remains, your Honor, that when

12   you file a mortgage application and you don't advise the

13   mortgage company of all of the pertinent facts,

14   particularly --

15             THE COURT:  When she applied, she didn't have a

16   judgment against her.

17             MS. BELL:  Absolutely she did.  She applied

18   March 10th.

19             THE COURT:  I thought she applied in February.

20             MS. BELL:  No, she did not apply in February.  She

21   applied March 10th.  The documentation, the documentation is

22   that the first time that she went to go talk to this guy, the

23   first time he takes notes about it is March 10th, ten days

24   after.

25             THE COURT:  Well, furthermore, that judgment didn't

```
1    impede their mortgage because apparently it wasn't recorded.

2    Otherwise, you would have executed on the house.  So

3    obviously the mortgage got ahead of the judgment recording.

4              MS. BELL:  The judgment was recorded under the name

5    Linda Castre Gosman.  The house is under the name Linda

6    Castre.  I can only imagine that the title company must have

7    missed it.

8              Also, your Honor, with respect to timing --

9              THE COURT:  Why don't they go -- if they think

10   their judgment has priority over the mortgage, why don't they

11   get the mortgage sent aside and grab the property?

12             MS. BELL:  Who?  The bankruptcy trustee?

13             THE COURT:  No, the mortgage company.

14             MS. BELL:  The mortgage company --

15             THE COURT:  I mean, the trustee who has the

16   judgment.  If he has a judgment that he feels is superior to

17   the mortgage, why doesn't he just say, hey, your mortgage

18   came after our judgment, we're going to take the --

19             MS. BELL:  Cost benefit analysis, your Honor.  I'm

20   sure that that was what was going on.

21             THE COURT:  Cost benefit analysis?  I don't know

22   that cost has ever been a factor in this case.

23             MS. BELL:  Well, apparently, your Honor -- what can

24   I tell you.  The fact of the matter is what the crime was

25   with respect to the mortgage fraud and what she did
```

```
 1    afterwards with the money, what the crime was with respect to

 2    the bankruptcy fraud, what the crime was with respect to the

 3    tax fraud --

 4          THE COURT:  She's not charged with doing something

 5    with the money afterwards.  She's just charged with not

 6    checking off a box saying that she has a judgment.

 7          MS. BELL:  Your Honor, she laundered the money so

 8    that she could keep it, so that she could hide the source of

 9    it.

10          THE COURT:  That's not charged.

11          MS. BELL:  That is absolutely part of the nature

12    and circumstances of the offense.

13          THE COURT:  But it's not part of the indictment.

14    The indictment says that she didn't tell them about a

15    judgment she had.

16          MS. BELL:  The question before the Court now under

17    3553 is looking at the nature and circumstances of the

18    offense, looking at the history and characteristics of the

19    defendant, looking at the need to send -- I don't have my

20    book in front of me -- the need to send a message to this

21    defendant and to the community about the need for respect for

22    the law and deterrence in the future.

23          Based upon all of those things, I have presented to

24    the Court what Mrs. Gosman did.  And as I said, I do have

25    some further argument.  I'll save that for after Mr. Bierman
```

1    presents his remaining witness and makes his argument.

2           THE COURT:  All right.  Mr. Bierman, you're up.

3           MR. BIERMAN:  I'm really not going to discuss all

4    of these matters that the Government just discussed because

5    they were all engulfed into a settlement in which the trustee

6    agreed that all of their judgments would be set aside and

7    that they would give Mr. Gosman $5 million to settle a $66

8    million judgment that he supposedly owed.  That goes to the

9    validity.

10          The matter that -- this argument about the ring is

11   a total about face because they used to argue that she hid

12   $700,000.  Now they're saying she didn't sell the ring.  It's

13   all -- quite frankly, I've been practicing criminal law for

14   almost 40 years, maybe more if I add them up, 44, and I have

15   never seen this aggressive a prosecution of a non-debtor in

16   bankruptcy.  We have to remember Lin Gosman was never in

17   bankruptcy.  She was joined in this bankruptcy for transfers.

18   And it's just appalling what we're going through here.

19          And the Government has argued that there is not a

20   sufficient deterrent.  Your Honor, Lin Gosman has admitted

21   she acted wrongly.  You've heard the testimony that she

22   panicked, that she had never seen anything like the

23   destruction of her marriage, the loss of her home, every

24   asset she had taken away from her and she had to live.  And

25   what was the structuring?  The structuring was her own money

1    coming back so that she could live because the bankruptcy

2    court as the -- what would appear to be doing whatever the

3    trustee asked refused to give her a living allowance which is

4    very common.  She had no living allowance from the bankruptcy

5    court.  She did wrong.  She admitted it.  She has pled to

6    this.  This was, your Honor, a nine-year persecution that

7    hasn't stopped.

8           Now, did she do right?  Of course not.  What have

9    been the results?  $350,000 to the IRS which she doesn't owe

10   except for penalties because the legal expenses which she

11   paid to protect her income are deductible.  I have

12   Mr. Foodman here.  I don't want to get into the issue, but he

13   has given me the report.  He has given me the case law which

14   says that legal fees paid to protect one's assets in

15   bankruptcy are a deductible business expense.  It sets aside

16   all of this.

17          So the $350,000 approximately that we agreed in the

18   plea agreement to pay and have, in fact, paid is for the

19   penalty of not reporting her foreign bank accounts.  Not for

20   tax she owed, but for the penalty for not reporting this.

21          In addition, $350,000 was forfeited to the United

22   States to cover the mortgage fraud.  And I've heard this

23   mortgage fraud described as one of the most egregious

24   mortgage frauds ever.  I've defended mortgage frauds, your

25   Honor.  And when they talk about egregious, what my clients

1   do are use phoney titles, phoney satisfactions, don't even

2   own the property that they're mortgaging.  And the banks were

3   giving them mortgages over the Internet, as the Court pointed

4   out, and to the prelude of our great recession was because of

5   these abuses.  At the time that Lin Gosman took this mortgage

6   that house was appraised at $500,000.  Now, the real estate

7   market, as we all know, has collapsed and it isn't worth

8   that.

9            No. 2.  If we want to proffer testimony, the

10  mortgage broker told me that they were well aware of all of

11  this.  It was in the newspapers every day of judgments, of

12  orders, of the dissolution of their marriage.  That was all

13  in the papers all of the time.  And so the mortgage company

14  was well aware of this.

15           Now, it does occur that certain people when called

16  before a federal grand jury and being intimidated by the

17  Government say, oh, no, no, no, we didn't know that.  But as

18  the Court points out, a search of the title would have

19  revealed that.  The mortgage was signed Linda Castre Gosman.

20  The name is in there.

21           And so, your Honor, I think that we do need to look

22  at this.  We do need to look at the crimes that were there,

23  and we need to look at the life of Lin Gosman.  We have

24  presented to you a sentencing memorandum which sets forth the

25  pre-bankruptcy Lin Gosman and the post-bankruptcy Lin Gosman,

1    the facts, the trauma that she's gone through, the punishment

2    that she's had, the fact that she was forced after staying in

3    jail for 28 days because the Government opposed her bond to

4    repatriate money from Switzerland which she ended up, as she

5    feared -- you know, she said I can't stay in jail.  I've got

6    to bring this money back.  And low and behold the money she

7    brought back ended up being paid over to the Government,

8    $700,000, placed into our trust account with some other

9    money, way over a million.

10           With fees and expenses at the present time Lin

11   Gosman's worth in my trust account from the Swiss accounts is

12   $330 out of over a million dollars.  700,000 of it going to

13   the Government, the rest of it going to living expenses

14   during the pendency of this matter and other expenses of

15   fighting this matter.

16           The Government says gratuitously we need to set an

17   example for the public.  I would defy the Government to find

18   me people that would like to be in the seat of Lin Gosman

19   now.  As a result of this indictment she has certainly lost

20   face in the community, she has lost every penny which she

21   wrongfully tried to preserve.  She's lost every penny that

22   she had.  She's spent almost a month in jail.  She has had

23   her marriage declared a farce.  She's had her life declared a

24   fraud by an aggressive bankruptcy trustee.

25           And it's sort of intriguing to me that the

1    Government that put together these huge books, that have

2    spent hours and hours didn't bother to look at the bankruptcy

3    fees.  Every fee is by Court order.  You just have to look at

4    them and add them up.  In excess of $22 million.

5         THE COURT:  Is this bankruptcy stayed, still open?

6         MR. BIERMAN:  I was told it was still open, but my

7    client's been discharged so -- well, Mr. Gosman.

8         THE COURT:  I assume the trustee and the attorneys

9    are still billing for their time in helping the Government

10   put this case together.

11        MR. BIERMAN:  I would certainly bet they are.  I

12   would certainly bet they are.  And they also settled in the

13   settlement all matters of fees.  Each side to bear their own

14   costs.  And that has continued.

15        Your Honor, I would suggest that under the

16   provisions of 3553 that we've set forth in length in our

17   sentencing memoranda that Mrs. Gosman is a candidate for the

18   variance.  And the probation officer at the last hearing, and

19   I'm sure the Court recalls, I asked her because I would never

20   take a comment that probation made to me in private and state

21   it publicly unless I had permission, I said can I tell the

22   Court that you believe that a variance is appropriate in this

23   case, and she said absolutely.  And you'll recall that I came

24   up and I said that.

25        Your Honor, this is a case in which a person who

1   led an outstanding life, who not -- giving money, I say this

2   flippantly somewhat, is somewhat easy to charity when you

3   have a lot.  Giving of one's self is not easy.  All of the

4   letters of the people, of the charities that she supported

5   talked about how she -- when they put their house available

6   to raise money for very important cancer cases, very

7   important arts, very important medical matters, that Lin

8   Gosman worked her tail off in each of those instances and put

9   herself into that.  That on a personal level that her

10  employees of the house that she ran all said that she got

11  involved in their personal lives as a friend.  Not in some

12  superficial way but in a way of caring about their concerns.

13         She was in the real estate business.  I believe

14  called a high-powered broker.  In her entire career she sold

15  one piece of property.  Many people get their real estate

16  license thinking they're going to do something and end up

17  doing their own deals.  She was not a high-powered real

18  estate agent.

19         I suggest, your Honor, that if ever the factors of

20  3553 come into play, they come in here.  During this period

21  of house arrest which she was under she worked as a volunteer

22  at the Morse Geriatrics Center.  That's helping elderly

23  people with the difficulties of life.  And they have

24  indicated that they would be delighted to have her continue

25  that work.

 1            And I suggest, your Honor, that an appropriate

 2    sentence in this case is time served, three years of

 3    probation, the first year to include house arrest, with 1,000

 4    hours of community service.

 5            The penalties that have already been exacted in

 6    this case of $700,000, of the cost of defending this case, of

 7    the emotional cost of this case have been immense, and any

 8    additional penalties I suggest to your Honor would continue

 9    what has been one of the most difficult imaginable periods in

10    anyone's life beginning in 2002 when her husband, and I point

11    out, her husband declared bankruptcy.  And there were no

12    allegations that he became insolvent as a result of fraud but

13    rather as a collapse of the health industry that he was very

14    involved with.

15            So I suggest to your Honor that when you take all

16    of these circumstances together, that she's been penalized

17    the $350,000 to IRS -- and I point that out very importantly

18    because I've been in cases where one of the conditions are

19    that a person pays their taxes, and that's only fair if they

20    owed taxes.  But based upon the costs which she expended of

21    over a million-four, which Mr. Foodman is present here and I

22    proffer to your Honor could present all of these numbers but

23    I don't see any point in prolonging this, and he has the case

24    law indicating that these are deductible costs that she would

25    owe no taxes, except for the FBAR penalties, and so that's

 1    one penalty.  The forfeiture to the Government is another

 2    penalty.  The loss of her freedom previously is another

 3    penalty that she suffered.  The fear which Dr. Alexander

 4    described is another penalty which she has suffered.

 5            And there comes a time, your Honor, to put this

 6    matter to rest, to put her on probation with credit for time

 7    served and to order her to commit 1,000 hours of community

 8    service in the first year and 500 hours of community service

 9    for the second and third year, and that punishment will be

10    more than enough to include -- which includes the public

11    humiliation.

12            There are cameras outside on every hearing, and

13    that may be the Government's intent.  And if that's their

14    intent, it has certainly worked because she has been hounded

15    by the press.  She has paid a penalty for this.  And I

16    suggest that the penalties that I have outlined and that have

17    already been paid are more than enough to put this case to

18    rest.

19            THE COURT:  Does the defendant wish to address the

20    Court?

21            MS. BELL:  Do you wish to hear from me first, your

22    Honor, or afterwards?

23            THE COURT:  I'll hear from her.

24            THE DEFENDANT:  Sorry, Judge.  Your Honor, I guess

25    it has been really all about survival, and for the last eight

1    years of my life it's just been a journey of survival.  There

2    were many things I thought could happen in my life such as

3    illness, serious injury, and even death, but I could not have

4    imagined my husband's bankruptcy and certainly could not have

5    imagined breaking the law.

6           During this long litigation I have been under

7    tremendous pressure.  I think anybody would.  Until the

8    bankruptcy I had limited knowledge of litigation and have

9    never been in a circumstance like this before.  All I saw was

10   my world collapsing that I had worked so hard for and there

11   was no support.  I longed for this to be over very much so

12   and in order to protect myself I panicked.  I did things that

13   were wrong, and I deeply regret what has occurred.

14          I am now 60 years old, and at this moment I feel

15   that my life has been ruined in part by my own actions, and

16   I'm sorry.  I hope your Honor can give me the necessary

17   chance to rebuild what life I have left.  Thank you.

18          THE COURT:  Thank you.

19          All right.  I'll hear from the Government.

20          MS. BELL:  I'm going to bring the Court back to the

21   crimes that are at issue here with respect to the factors

22   under 3553.  I know the Court is well aware of these factors.

23   The need for the sentence imposed to reflect the seriousness

24   of the offense, to promote respect for the law, and to

25   provide just punishment for the offense, to afford adequate

1    deterrence to the criminal conduct.

2            I'm going to start this time with the tax fraud.  I

3    said last time this was not your garden variety tax fraud,

4    and it's not.  Mrs. Gosman used the word "panic" when she was

5    talking about what she did.  Her tax fraud was not the result

6    of panic.  She went to an asset protection lawyer.  She paid

7    him to set up a nominee trust in Belize.  She paid him to set

8    up a nominee account in Switzerland.  Through the years she's

9    paid him to set up -- to change the names of the nominee

10   trusts and the locations from Belize to the British Virgin

11   Islands and from the accounts at Bank Suisse to Baumann & Cie

12   and to all of these other places.  She earned dividends and

13   interest on millions of dollars in 2004, five, six, seven,

14   and eight which to date she has not reported.

15           THE COURT:  Has she gotten an extension to file

16   these?

17           MS. BELL:  No.  No.  And even if she did, your

18   Honor, the extension has long passed.

19           THE COURT:  Why didn't the Government take any

20   action on that?

21           MS. BELL:  That's why we're here, your Honor.

22           THE COURT:  No, it isn't.  It is here because you

23   charged her with not telling about an account overseas.  You

24   haven't said -- filed any charges for not paying taxes in

25   2006, 2007, 2008.

```
 1            MS. BELL:  Part of her proffer, your Honor, part of

 2    her relevant conduct on the tax was absolutely -- the tax

 3    count included as relevant conduct all of those other years.

 4            THE COURT:  You don't even know if she owes any

 5    money at all for those years.

 6            MS. BELL:  Your Honor, I actually briefed the Court

 7    on this in the documents that I gave the Court.  This

 8    argument by Mr. Bierman that these legal fees are deductible

 9    is absurd.  First of all, the taxpayer has the burden.

10            THE COURT:  Well, maybe we ought to hear from the

11    witness if it's so absurd.  I would like to hear that.

12    Because he says he has a witness who has cases that say they

13    are deductible.

14            MS. BELL:  I would be more than happy to

15    cross-examine him.

16            THE COURT:  Let's call him them.  Call the witness.

17         STANLEY I. FOODMAN, DEFENDANT'S WITNESS, SWORN

18            THE COURTROOM DEPUTY:  Please state and spell your

19    name for the record.

20            MR. BLOOM:  Stanley Foodman.  S-T-A-N-L-E-Y.

21    Middle initial I.  Foodman, F-O-O-D-M-A-N.

22                         DIRECT EXAMINATION

23    BY MR. BIERMAN:

24    Q    Mr. Foodman, what is your occupation, sir?

25    A    I'm a certified public accountant licensed in the State
```

1  of Florida, certified fraud examiner, and certified in

2  financial forensics by the American Institute of Certified

3  Public Accountants.

4  Q    And were you engaged to review Mrs. Gosman's tax

5  liabilities?

6  A    Yes, sir.

7  Q    And did you make calculations for the years 2004, five,

8  six, and seven?

9  A    Yes, sir.

10  Q    And did you review the tax law with regard -- well, let

11  me go back a step.

12          As a certified public accountant do you appear

13  before the Internal Revenue Service?

14  A    Yes, sir.

15  Q    And are you permitted to do so as a representative of

16  taxpayers?

17  A    Yes, sir.

18  Q    And is tax accounting a major part of your practice?

19  A    Yes.

20  Q    Going back a step, were you involved in law enforcement

21  at one time?

22  A    Yes.

23  Q    And what position did you hold?

24  A    I was an agent with the Florida Department of Law

25  Enforcement assisting them with the investigation of economic

1    crimes.

2    Q    You were in financial fraud?

3    A    Yes.

4    Q    How many years were you with FDLE?

5    A    I worked at that agency from 1987 through the end of

6    1989.  Three years.

7    Q    And would you tell the Court, sir, what research you did

8    and what the result of that was with regard to the

9    deductibility of legal fees in a matter such as

10   Mrs. Gosman's?

11   A    Generally legal fees are not deductible on individual

12   tax returns.  However, in 1963 the United States Supreme

13   Court rendered the following decision.  And I quote -- this

14   is US v. Gilmore cited at 372 US 39.  "We resolve the

15   conflict among the lower courts on the question before us in

16   favor of the" --

17   Q    Go slower, please.

18        MR. BIERMAN:  Your Honor, might I hand up to the

19   Court the written report which would be an aid to the Court.

20        THE COURT:  Certainly.

21        MR. BLOOM:  I'm quoting the decision of the US

22   Supreme Court.

23        "We resolve the conflict among the lower courts on

24   the question before us in favor of the view" --

25        MS. BELL:  Can I ask you just to tell me where

1  you're reading from?

2          MR. BLOOM:  I'm on the front of the three-page

3  report, the first page that I presented to Mr. Bierman which

4  he's presented to you, I believe.

5          May I begin?

6          MR. BIERMAN:  Yes.

7          MR. BLOOM:  "We resolve the conflict among the

8  lower courts on the question before us in favor of the view

9  that the origin and character of the claim with respect to

10  which an expense was incurred, rather than its potential

11  consequences upon the fortunes of the taxpayer, is the

12  controlling basic test of whether the expense was 'business'

13  or 'personal', and ends whether it is deductible under

14  Section 23(a)(2)."  That was in 1963.

15  BY MR. BIERMAN:

16  Q    Has that section been changed in number?

17  A    Yes, we're now dealing with Code Section 162.

18          And in 1981, on September 21, 1981, the United

19  States Tax Court rendered the following decision in Herbert

20  E. Cox.  "In this case petitioner's bankruptcies were

21  proximately caused by their inability to pay the debts of

22  Jean's Western Wear, which was a business.  While it is true

23  that the fresh start afforded petitioners and the protection

24  of their exempted property or personal benefits, we find that

25  they are the consequences of the petitioner's bankruptcies

1    rather than the origin or cause of the bankruptcies.   In

2    fact, they are the consequences of the type the Supreme Court

3    in Gilmore held could not be used to determine whether an

4    expense is business or personal in nature.   These

5    consequences do not control the deductibility of the

6    attorney's fee incurred by petitioners in filing their

7    bankruptcy petitions.   Respondent's position is also weakened

8    by his inability to point to any factor other than the

9    failure of the petitioner's business as the approximate cause

10   for the expense in question."

11        In Stephen F. Scofield, et al., v. the

12   Commissioner, Tax Court Memorandum 1997-547, which covers

13   Code Sections 67, 162, 166, and 212, the United States Tax

14   Court on December 11, 1997, rendered the following decision.

15   "Petitioner's bankruptcy legal expenses were attributable to

16   his business or investment since Northeast's failure forced

17   him to seek bankruptcy protection.   The debts listed in his

18   bankruptcy petition related almost exclusively to Northeast.

19   The plaintiffs in the adversary proceedings were creditors of

20   Northeast.   Fees paid to the petitioner's bankruptcy petition

21   and legal fees paid to defend claims against the petitioner

22   in adversary proceedings had their origin in petitioner's

23   conduct as an employee and investor/shareholder of Northeast

24   and thus related to activities engaged in by the petitioner

25   to produce income."

1          "Sections 162, 212(1).  We hold that petitioners

2     may deduct their legal fees in 1986, 1987, and 1988 relating

3     to petitioner's Northeast litigation and adversary

4     proceedings subject to limits of Section 67."

5          That means that on -- these legal fees would be

6     deducted on Schedule A of the tax return subject to the 2

7     percent floor limitation under Code 67.

8          Based on my understanding of Internal Revenue Code

9     162 and the principles as rendered by the Court's controlling

10    the deductibility of legal fees by taxpayers in Form 1040, we

11    have taken the tax position because the origin and charter of

12    the legal fees deducted arose from a business bankruptcy,

13    they are allowable under IRS Section 162 subject to

14    limitations of Code Section 67, and it was my opinion as a

15    result that there was no federal tax liability.

16    Q    All right.  Now, in making this determination you've

17    prepared some tax returns that have not yet been filed; is

18    that correct?

19    A    That's correct.

20    Q    And as an enrolled CPA, in which all CPAs are enrolled,

21    you have to follow certain guidelines; that is to say that if

22    you claim a deduction, you have to be convinced of its

23    correctness; is that right?

24    A    Right.  We have to have support for the deduction.

25    Q    Now, if you filed this tax return, an IRS agent, revenue

1   agent received this and rejected it, what remedies would you

2   have?

3   A     We could go to the appeals section of IRS.

4   Q     And at the appeals section of IRS is it likely or not

5   likely that they would settle this matter?

6   A     The appellate officer would be there to consider the

7   risks of litigation for the Government and would make a

8   decision as to whether or not they would grant all of the

9   deductions, part of the deductions, or none of the

10  deductions, at which point we could then appeal to the tax

11  court which would send this right back to the appellate

12  division for another round.

13  Q     All right.  And assuming that IRS appellate division

14  were to disallow half of your deduction, what would be the

15  result?

16  A     There would still be no tax owed.

17  Q     Now, in attempting to put together this tax matter did

18  you attempt to get documents from Mrs. Gosman?

19  A     Yes.

20  Q     And did she inform you that the trustee had seized all

21  of her personal records?

22  A     Yes.

23  Q     And that she did not have access to them?

24  A     That's correct.

25  Q     And she just went to third parties to gather as many

1    documents as she could?

2    A    She told us she couldn't get any documents from the

3    trustee and she was working to get them from banks and other

4    sources.

5    Q    And based upon the capital gains rate at the time,

6    assuming that everything was disallowed what would be the

7    amount of taxes that every deduction for legal expenses

8    paying the bankruptcy, what would be the tax liability?

9    A    The tax -- well, if all of the deductions were

10   disallowed --

11   Q    When I say "all," I mean the ones that were in dispute

12   now.

13   A    Right.  If those were disallowed, then Ms. Gosman would

14   certainly have the 15 percent tax on capital gains, and her

15   total capital gains over the period in question in 2005 were

16   85,495.  In 2006 were 534,200.

17   Q    Just give us a total.

18   A    It's going to be somewhere around $619,000 in capital

19   gains.  She would get some small offsets for capital losses.

20   And so she would pay a 15 percent tax which would be around

21   $90,000.  And then to the degree she had dividends or

22   interest she would pay tax at her maximum rate which on those

23   items a maximum marginal rate which I had not calculated

24   because I calculated the tax completely on the deductions.

25   But the tax would not be substantial because she did have

 1   other itemized deductions in addition to these disputed

 2   deductions which were substantial over the period of time.

 3   Q    She had substantial interest paid on her Trump property

 4   and her Sea Scapes property; is that right?

 5   A    $603,000 between 2004 and 2007.  She had property taxes

 6   paid of 195,546.  And she had some gifts to charity totaling

 7   $10,219.

 8   Q    Is it fair to say that any tax liability which she had

 9   would be the result of the FBAR penalties for failure to

10   report?

11   A    Well, that's the tax position I've taken and that's the

12   tax position that I believe to be correct.

13              MR. BIERMAN:  May I have just a moment, your Honor?

14       (Pause in Proceedings.)

15   BY MR. BIERMAN:

16   Q    Now, Mr. Foodman, Mrs. Gosman was not the bankrupt; is

17   that correct?

18   A    That's correct.

19   Q    Does it make a difference in your determination of the

20   law on that?

21   A    I don't think it does.  The supreme court on the other

22   courts simply determined -- actually, the supreme court

23   determined, the other courts followed its course of decision,

24   which says that if -- that essentially the origin and

25   character of the claim are what determine the deductibility.

```
 1    So that if the origin and the character of the cost that

 2    Mrs. Gosman incurred were the result of a business

 3    bankruptcy, then I believe that the origin and character

 4    would return back to the business bankruptcy and make them

 5    deductible under Section 162.

 6              MR. BIERMAN:  I have nothing further.

 7              THE COURT:  Cross-examination.

 8                         CROSS-EXAMINATION

 9    BY MS. BELL:

10    Q    Now, sir, you did say that you already have prepared tax

11    returns for Ms. Gosman?

12    A    I have tax returns prepared.

13    Q    Okay.  And those have not been filed?

14    A    That's correct.

15    Q    Now, in preparing those tax returns you looked at bank

16    records?

17    A    Yes.

18    Q    In particular foreign banks records?

19    A    I looked at whatever banks records were provided to me.

20    Q    Well, which bank records were those?

21    A    Which included foreign bank records and domestic bank

22    records.

23    Q    And those records were provided to you by Mrs. Gosman?

24    A    Through counsel, yes.

25    Q    And how many accounts did you take a look at?
```

1    A    There were several accounts.

2    Q    How many foreign accounts?

3    A    There were -- I believe there were at least two.  There

4    may have been more.  I just don't remember right now.

5    Q    Okay.  And you also looked at documents that you

6    obtained from Rampell and Rampell, the accountants who were

7    preparing her 2004 return?

8    A    I did look at those documents, yes.

9    Q    They had about nine boxes worth of documents?

10   A    Whatever was presented to me by counsel is what I looked

11   through which were the tax returns and documents that were

12   provided.

13   Q    Okay.  And these legal fee documents, those were all

14   documents relating to Mrs. Gosman's legal fees; isn't that

15   right?

16   A    Yes.

17   Q    Okay.  So none of the documents that you looked at were

18   documents from the trustee or that the trustee would have

19   had; isn't that right?

20   A    I was not provided with the trustee's documents.

21   Q    Right.  And none of those documents were relevant to

22   determining how much income she had or whether her legal

23   expenses were deductible; isn't that right?

24   A    Could you restate the question?

25   Q    None of -- there's no records that the trustee would

1   have that would be relevant in determining how much income

2   she had from her foreign accounts or what her personal legal

3   expenses were.

4            THE COURT:  That's a statement.  That's not a

5   question.

6            MS. BELL:  I thought this was cross-examination,

7   your Honor.

8            THE COURT:  Well, I know.  But what's the question?

9   You made a statement.  You want to say you agree with that

10  statement or not?  But you just made a statement.

11  BY MS. BELL:

12  Q    Isn't that correct?

13           THE COURT:  Oh, all right.

14           THE WITNESS:  I don't know what documents the

15  bankruptcy trustee had in his possession that would have

16  affected my calculations since I was never presented with

17  those documents; therefore, I cannot render an opinion as to

18  whether or not they would have had anything in them that

19  would have affected my testimony.

20  Q    But with respect to the foreign income and with respect

21  to her personal legal expenses, she gave you all of that

22  documentation; isn't that right?

23  A    All that documentation came to me from counsel and I

24  suspect from Ms. Gosman.

25  Q    Now, with respect to her personal returns, you filed her

1   as married filing separately, correct?

2   A    I haven't filed any returns yet.   I prepared returns.

3   Q    Well, do you intend to have her file as married filing

4   separately?

5   A    We've taken the tax position that she is married filing

6   separately.

7   Q    And is there any kind of an exemption anywhere in the

8   Internal Revenue Code for anyone who's involved in litigation

9   for them to not file a tax return?

10  A    Oh, no.

11  Q    Or how about someone involved in a bankruptcy?

12  A    Unless stayed by the bankruptcy court, no.

13  Q    And that of course wasn't the case here, correct?

14  A    That's correct.

15  Q    Okay.  And with respect to the deductibility of these

16  legal fees, you're citing the Gilmore case?

17  A    Yes.

18  Q    Now, you understand that in the Gilmore case the Gilmore

19  case was a case where the Court found that certain expenses

20  were personal as opposed to business expenses --

21  A    That's correct.

22  Q    -- and ultimately decided that those expenses were not

23  deductible?

24  A    That's correct.

25  Q    And in the Gilmore case the issue was whether expenses

| | |
|---|---|
| 1 | essentially relating to the title of property, the ownership |
| 2 | of property were properly deductible as personal expenses or |
| 3 | business expenses? |
| 4 | A    Yes. |
| 5 | Q    So the supreme court and the IRS under regulation 212, |
| 6 | and -- I'm sorry, under Statute 212 and under Regulation |
| 7 | 1.212 has made very clear that expenses relating to defending |
| 8 | the costs of perfecting title or of determining who owns |
| 9 | certain property are not deductible, correct? |
| 10 | A    Well, actually, the IRS has its own set of regulations. |
| 11 | And when they don't acquiesce, they continue to go down the |
| 12 | path that they want to go down.  But in Gilmore they |
| 13 | specifically said that the test of whether an expense was |
| 14 | business or personal and hence whether it's deductible is a |
| 15 | function of the origin and character of the claim.  That's |
| 16 | why under Cox legal expenses related to the bankruptcy were |
| 17 | deductible, because all of those legal expenses resulted from |
| 18 | the bankruptcy filing of a business and, therefore, all of |
| 19 | the expenses attributable to that were deductible. |
| 20 | Q    Now, in Cox that was a case about the owners of a |
| 21 | business; isn't that right? |
| 22 | A    That's correct. |
| 23 | Q    Mrs. Gosman was not the owner of a business; isn't that |
| 24 | right? |
| 25 | A    That's correct. |

1  Q    And Mr. Gosman's bankruptcy was a personal bankruptcy,

2  correct?

3  A    That's correct.

4  Q    So with respect to all of these issues would it be fair

5  to say that you would expect perhaps or the IRS would have

6  reasonable grounds to argue that her legal fees that were

7  incurred were incurred in an attempt for her to retain title

8  to property that pursuant to the bankruptcy court's order

9  actually belonged to her husband's bankruptcy estate?  Would

10  you agree that there would be reasonable grounds for them to

11  make that argument?

12  A    The IRS's position is to collect tax.  That's what their

13  function is.  However, if I go back to the origin and

14  character of the cause of the litigation, the origin and the

15  character of the cause of the litigation is the failure of

16  Mr. Gosman's business.  And as a result it logically flows

17  that the costs relating to that, including the defense of the

18  property which are now the subject of being seized by the

19  bankruptcy court, would be deductible under 162.

20  Q    I'm not challenging that this is an argument that you

21  may wish to make, but you would agree that the IRS would

22  certainly have reasonable grounds for making the opposite

23  argument?

24  A    I think the IRS would certainly argue the point.  That's

25  what their job is.

Q    Okay.  And of course with respect to these types of things, it is the taxpayer's burden to prove that expenses are deductible; isn't that right?

A    It is the tax -- the taxpayer has the burden of supporting the deductibility.  The taxpayer can rely on many ways of doing so, including precedents set by the Court with respect to these things.  And that's the tax position I've taken.

Q    And again, just to make it very simple, it is the taxpayer's burden, correct?

A    In civil matters it's generally the taxpayer's burden.

Q    Okay.  And in this particular case, of course, we still don't have any returns, the IRS still hasn't seen any documentation, there isn't anything before the IRS that it could even begin to use to determine whether this type of an argument is one that they would agree with?

A    I don't know what the IRS has.  I only know what was provided to me.

Q    Well, you certainly know that they don't have tax returns, correct?

A    As far as I know no returns have been filed.

Q    And with respect to the deductibility of these, you take the position that they are deductible under 162, I think it is, as business expense of some kind?

A    On Schedule A miscellaneous expenses which are

1   deductible because they come from business origin and

2   character.

3   Q    And of course that is subject to that 2 percent floor

4   that you were talking about?

5   A    That's correct.

6   Q    All right.  And then there would also be at least the

7   possibility of an alternative minimum tax; isn't that right?

8   A    Actually, we calculated that there's no alternative

9   minimum tax.

10  Q    But there would be the possibility depending upon the

11  position the IRS took; isn't that right?

12  A    There's always -- the IRS -- there's always the

13  possibility that the IRS can take a position which will allow

14  it to assess a tax or assess a deficiency.  That's true in

15  every case.

16  Q    Right.  And, in fact, as you pointed out, that's their

17  job?

18  A    Of course.  That's why they're there, to collect taxes.

19  Q    And as you said before, although we don't have any

20  returns and we can't determine what her tax liability is,

21  regardless she would be looking at substantial penalties for

22  failing to report her foreign bank accounts; isn't that

23  right?

24  A    I don't think that I was asked anything about the FBAR

25  accounts, that there are substantial penalties, other than

1    the fact that there is a penalty and I believe it has been

2    agreed to at this point.

3    Q    Well, in fact, civilly, I think that's what we're

4    talking about now, the FBAR penalties can be as much as

5    100 percent of the amount that was in the account at any

6    particular time; isn't that right?

7    A    Under the current rules, sure.

8            MS. BELL:  Okay.  I have nothing further.

9            MR. BIERMAN:  I just have one question.

10                        REDIRECT EXAMINATION

11   BY MR. BIERMAN:

12   Q    Mr. Foodman, when you said that the tax penalties were

13   agreed to, did I tell you to prepare -- ask you to prepare

14   draft tax returns so that we would know what the true

15   liability was since the Government had told me that IRS was

16   going to accept the $350,000 to cover all of her tax

17   liability including penalty?

18   A    Yes.

19           MR. BIERMAN:  Thank you.  I have nothing further.

20           THE COURT:  All right.  You may step down.

21           MR. BLOOM:  Thank you, your Honor.

22      (Pause in Proceedings.)

23           THE COURT:  Obviously I'm not going to resolve this

24   dispute.  I have credible testimony from a witness here, and

25   I'm sure that IRS could -- you don't have a witness

1   apparently, but an IRS witness may disagree and it might take

2   a decision of the supreme court to resolve it.  So I'm going

3   to set that issue aside and not be concerned with it.

4            MS. BELL:  I think that the issue for the Court,

5   your Honor, is simply we have a woman who has millions of

6   dollars in an oversees account that she's not reporting and

7   whatever the tax liability -- I mean, as I said, we start out

8   with $3.3 million in the account.  Whatever the tax

9   liability, whatever the dividends and interest she's earning

10   on that money as we sit here today we don't know because she

11   still hasn't filed these tax returns.

12            THE COURT:  And according to this witness she

13   doesn't owe anything.

14            MS. BELL:  Your Honor, the burden -- the position

15   that this witness is taking is a position that is very

16   aggressive.  The position that this witness has taken is

17   one --

18            THE COURT:  Are you suggesting that the IRS isn't

19   an aggressive pursuer of taxes?

20            MS. BELL:  The burden is on the taxpayer.

21            THE COURT:  I know.  But what I'm saying is it's a

22   moot issue at this time and it's not before me.  So I'm

23   putting it aside, and you would do well to proceed with

24   something else.

25            MS. BELL:  Mrs. Gosman's conduct with respect to

1    her taxes is not the conduct of a woman who's panicked or of

2    a woman who is disabled in some way by her shame and

3    humiliation.  This was a calculated, deliberate, long-term

4    scheme to keep from having to pay her fair share of taxes.

5           Now, there was some discussion about this $350,000

6    that Mrs. Gosman has already paid to the IRS.  And we have

7    all said that this number is made up because there are no

8    records and no returns or anything.  But Mr. Bierman referred

9    to it as a penalty.  It is not a penalty.  It is what she

10   would have had to pay regardless.  Whether it be as part of

11   her civil penalty for not having reported the return, whether

12   it be for the taxes, whatever it is, it is not part of her

13   criminal penalty.  It is restitution to the IRS, simply

14   putting her in the same position as every other taxpayer.

15          Now, the Court mentioned before about the other

16   people similarly situated.  And of course under 3553 that is

17   something that the Court needs to take into consideration.

18   It's been published that there are 19,000 Americans with

19   undisclosed accounts just at UBS.  That doesn't include --

20          THE COURT:  I grossly underestimated.  I said

21   5,000.  But 19,000.  All right.

22          MS. BELL:  And that doesn't include the millions of

23   Americans with accounts at places like Bank Suisse, like

24   Mrs. Gosman, and Brown Brothers Harriman & Company, Baumann &

25   Cie, or accounts held in Hong Kong or Panama and other

```
 1    international tax havens.  Millions, trillions of dollars are
 2    not being paid in taxes in this country in the midst of our
 3    financial crisis.
 4          And more importantly, who is paying those taxes?
 5    Those taxes are being paid by people who are paying taxes.
 6    People who are paying taxes are having to pay for Mrs. Gosman
 7    and all of the others who have these unreported foreign
 8    accounts.  She wants you to say that because she's simply had
 9    to pay what she should have paid before, that that's
10    punishment enough.  Now, I can't help but think of Leona
11    Helmsley's line and that mentality of only the little people
12    pay taxes.
13          The message that needs to be sent to Lin Gosman and
14    to all of those who maintain these kinds of accounts is that
15    if you persist in breaking the law, if you expect the little
16    people to cover your fair share of the price that we all have
17    to pay for living in this country, there are not just
18    financial consequences.  You are going to go to jail and
19    you're going to go to jail for a substantial period of time.
20          With respect to the mortgage fraud, there's been an
21    issue about this forfeiture, as if that's some kind of a
22    penalty.  Forfeiture, your Honor, is simply someone not
23    getting to keep their ill-gotten gains.  Now, under the
24    guidelines because of the way -- because Washington Mutual is
25    still collateralized, the mortgage fraud really has no affect
```

1    on the guidelines.  But that $350,000, it wasn't hers.  It

2    wasn't hers.  And just like a bank robber doesn't get to keep

3    the money --

4              THE COURT:  Did the Government take the $350,000?

5              MS. BELL:  Yes, it was forfeited.

6              THE COURT:  You didn't give it to the creditors who

7    are apparently the ones who needed the money.

8              MS. BELL:  Your Honor, it was the Government's

9    position --

10             THE COURT:  So it was a fine then.

11             MS. BELL:  I'm sorry.  What?

12             THE COURT:  It's like a fine.  In other words, very

13   often the Court will enter a fine for violating the law.  You

14   took it like a fine because you weren't the victim of this

15   mortgage fraud.

16             MS. BELL:  We -- a bank robber, a drug dealer, they

17   forfeit the money that they've earned from wrongdoing.  It is

18   not okay for someone who's done something wrong to get to

19   keep that money.

20             THE COURT:  I've got to follow this.  The wrong she

21   did was taking out the mortgage?

22             MS. BELL:  Yes.

23             THE COURT:  And why was that wrong?

24             MS. BELL:  It was wrong for two reasons.  It was

25   wrong because it was a crime for her to get that mortgage

1   without disclosing the fact she had a judgment.  And it was

2   also a crime --

3           THE COURT:  Wait a minute.  That's not a crime.

4   That's not telling the mortgage company about it.  I thought

5   maybe it was a violation of some bankruptcy order that she

6   was -- but in that case the money ought to go to the

7   bankruptcy court and distribute it to the creditors.

8           MS. BELL:  The money -- it is a crime, your Honor.

9   It is a crime to lie under oath in order to get a mortgage

10  and not disclose a judgment.

11          THE COURT:  Well, okay.  She didn't check the box

12  that said there's a judgment against me.  But why does the

13  Government get to keep the money then?

14          MS. BELL:  Because --

15          THE COURT:  Because it's a fine, right?

16          MS. BELL:  -- she shouldn't get to keep the money.

17          THE COURT:  So it's like if I say, okay, you're

18  fined $350,000 for doing this, but the Government's already

19  collected that so that's the end of that story, right?  She's

20  already paid for that violation by the fine the Government

21  extracted from her prior even to filing the indictment.

22          MS. BELL:  That money was forfeited to the

23  Government because it was ill-gotten gains --

24          THE COURT:  It was a fine.

25          MS. BELL:  -- it was ill-gotten gains that she

1   wasn't allowed to keep in the Government's estimation.  I

2   would point out to the Court she was actually subject to over

3   $700,000 in forfeiture.  And as part of the plea we agreed to

4   only have her pay as forfeiture the 350 rather than the

5   entire 700.

6           THE COURT:  I thought she only got 350.  Is it

7   double?

8           MS. BELL:  The forfeiture -- the other forfeiture

9   money came from the structuring.

10          THE COURT:  But that wasn't charged in the

11   indictment.

12          MS. BELL:  Yes, it was charged in the indictment.

13          THE COURT:  She didn't plead to that.

14          MS. BELL:  That was part of our plea agreement,

15   that she didn't plead to the structuring counts so she

16   wouldn't have to pay --

17          THE COURT:  So now you want to resurrect the things

18   that were dismissed out.  Maybe she wouldn't have pled if she

19   knew you were going to bring this back up.

20          MS. BELL:  Your Honor, four purposes of determining

21   a variance all of this is pertinent in determining whether or

22   not anymore concessions should be made to her.

23          She claims that she's penniless because she had to

24   forfeit this money and because she had to pay her taxes like

25   everybody else and because of that she's suffered enough.

1   You know, as for being penniless, your Honor, I would again

2   point out this is an able-bodied woman capable of working.

3   She still owns two houses; Trump Tower which still has equity

4   in it, and this house in Jupiter.  She has multiple storage

5   units which she's still paying for, some that have furniture

6   in them.  She has still provided no documentation regarding

7   what happened to all of that jewelry.  And she has a husband

8   who lives --

9            THE COURT:  She doesn't have to produce anything

10   more.  They settled.

11            MS. BELL:  For purposes of the Court -- for

12   purposes of her coming before the Court and saying she's

13   penniless, the fact is there is still no documentation to

14   date about what happened to that.

15            THE COURT:  Do you feel like she's under some

16   obligation to come up with something?  The case is over with,

17   the bankruptcy.

18            MS. BELL:  Actually, your Honor, I do think that

19   for purposes of a PSI in disclosing all of your assets it

20   is -- yes, if there are still assets out there, she needs to

21   disclose them.

22            THE COURT:  Well, do you know that there are assets

23   out there?

24            MS. BELL:  I don't know that there are assets.

25            THE COURT:  So you think there is.

1          MS. BELL:  I think the fact that there is no

2     documentation of what happened to $2 million in jewelry from

3     a woman who keeps a coffee receipt for $7 is highly

4     suspicious, and I think that that is the kind of information

5     that the Court should be made aware of in determining whether

6     or not a variance is appropriate.

7          She also has a husband who lives separately from

8     her in a condominium in a building whose residents are a

9     who's who not just of Palm Beach but of the world, a husband

10     who still reports having substantial assets and who has made

11     clear --

12          THE COURT:  What's that got to do with this case?

13          MS. BELL:  She said, your Honor, that she is

14     penniless, and I would submit to you that while clearly

15     there's been a lifestyle change for her, it's a long way from

16     saying that she is penniless when she still owns two

17     properties and still has a husband who has assets who says

18     he's going to take care of her.

19          And for purposes of determining a reasonable

20     sentence, again, the fact that we -- that she only forfeited

21     350,000, and not the 700,000, is also significant.  You know,

22     the fact -- you keep talking about a fine.  The fact that she

23     committed a crime should not allow her to be in a better

24     financial position than if she had not.  There were no

25     grounds and no basis for her to have been allowed to keep

1   that money from the mortgage fraud, to say nothing of the

2   money that she owes in tax.  And under 3553 or any other

3   statute or any case law of any kind, the fact that she's paid

4   that money is not a basis to give her a variance on a prison

5   sentence, which brings us to the bankruptcy fraud.

6          Bankruptcies are horrible.  From the creditors'

7   perspective they're owed money because they provided services

8   and weren't paid, because they made a loan and weren't paid,

9   and they're not going to get paid back most likely.  From the

10  debtor's perspective, from the perspective of the person who

11  files bankruptcy, there is almost always a tragic catalyst

12  that causes the filing of a bankruptcy.  In most cases it's

13  something out of people's control, something unforeseen,

14  unplanned; health reasons.  Someone gets horribly sick and

15  have enormous medical bills.  Someone losses their job.  The

16  market takes a downturn.  Someone has their life savings

17  stolen by Bernie Madoff or by somebody else and losses

18  everything.  And in almost every bankruptcy the victims of

19  this tragic catalyst are not just the debtor, not just the

20  person who files for bankruptcy, but their whole family.

21         The bankruptcy code actually has as its mission to

22  give debtors a fresh start.  It is very debtor oriented.  And

23  most bankruptcy judges really try hard to be very debtor

24  oriented.  But as unfair as the reason behind a bankruptcy

25  may be, the fact that someone's had to file bankruptcy is

```
1    because they owe more than they can afford and their

2    lifestyle and the lifestyle of their family is going to have

3    to change drastically.

4           THE COURT:  Are you suggesting that that hasn't

5    happened here?

6           MS. BELL:  I'm suggesting that that happens in

7    every bankruptcy --

8           THE COURT:  Oh, yes.

9           MS. BELL:  -- all of the millions of bankruptcies

10   that are failed every day.  Every single bankruptcy has a

11   story similar to the Gosmans.  Every single one of them.

12          Now, this Court has noted in the past that

13   bankruptcy is one of the pillars of our economy and that

14   bankruptcy fraud shakes the very foundations of our financial

15   system.  If people coming to the bankruptcy system don't play

16   by the rules, if they hide things, if they steal things, if

17   they lie to the Court, it is not just the particular victims

18   of that bankruptcy that are harmed.  It is the bankruptcy

19   court and the very institution of bankruptcy, that pillar of

20   our economy that is harmed.

21          If every one of Bernie Madoff's victims who ends up

22   having to file for bankruptcy is allowed to hide their

23   oversees accounts and lie, if every person who goes through

24   cancer treatments is told you've suffered enough, you don't

25   have to be honest, if every executive who losses their job
```

1    and their status in the community is told it's okay to have

2    hidden storage units, the fact that you've lost your status

3    in the community, that's punishment enough, this pillar of

4    our economy, our bankruptcy system will be broken.  The

5    system cannot work if perjury and concealment are allowed.

6            Now, we've heard a lot about Mrs. Gosman's

7    humiliation and her shame.  She's blamed it on the marital

8    order.  But there's no question it was because of the whole

9    thing, because of the bankruptcy and because of the drastic

10   change in her lifestyle.  It is a shame and humiliation that

11   everyone who files for bankruptcy and every family member

12   that's affected by a bankruptcy no doubt experience.  We can

13   feel sympathy.  And, in fact, I know I do feel sympathy for

14   Mrs. Gosman for having to go through the shame and

15   humiliation that she experienced from her husband's

16   bankruptcy.

17           But we must be clear.  The bankruptcy and the loss

18   of her lifestyle was a separate set of circumstances from the

19   crimes that she's committed.  Even if she had not committed

20   those crimes, the shame and humiliation that she experienced

21   from the bankruptcy that all people experience from

22   bankruptcy would still exist.  Shame and humiliation cannot

23   give people a license to lie and it cannot -- disagreement

24   with a Court order cannot be a license to steal.  There

25   cannot be a gray area where shame and humiliation from a

1   bankruptcy obviate the need for substantial punishment of

2   criminal misconduct.  Whatever the tragic catalyst for

3   Mrs. Gosman's shame and humiliation it cannot be that that

4   universal feeling that she had because of this bankruptcy is

5   the only consequence of her crime.

6         Now, Mrs. Gosman was quoted as saying how the

7   community is horrified by this prosecution of her.  She acts

8   in many ways, your Honor, as if she is the victim, not the

9   villain, not the criminal.  If the message to her community,

10   to our community is that if you lie, if you steal, if you

11   cheat, you can expect a slap on the wrist, a thousand hours

12   of community service and these other things that Mr. Bierman

13   presented, what's to stop everyone from doing it?

14         I saw a comic recently, a bunch of men standing

15   around a table, executives standing around a table, and the

16   tag line was, you know, if we do this, we may be looking at

17   many thousands of hours of community service.

18         The incentive, the stick of punishment needs to be

19   there for these kinds of crimes.  If all we give is a slap on

20   the wrist, people aren't going to trust the system.  We're

21   seeing more and more bankruptcies filed every day by formerly

22   wealthy people who are overextended.  There are not separate

23   rules regarding honesty and concealment for Mrs. Gosman's

24   community.  Mrs. Gosman and her community and our community

25   need to know that everyone plays by the same rules,

1   punishment for crimes as egregious and outrageous as

2   Mrs. Gosman's.  And, your Honor, they were egregious and

3   outrageous.  The bankruptcy crimes and separately the tax

4   crimes must be more than just financial or token.  There must

5   be a substantial jail sentence associated with them.

6             Now, the sentence that we are proposing is a

7   reasonable sentence.  One of the reasons I've talked about so

8   many of these things is because in considering a variance the

9   Court needs to consider what breaks, if you will, the

10  defendant has already received.  And in this case one of the

11  breaks we talked about was with respect to loss and how the

12  loss was limited to two to $400,000.  And it was just limited

13  to what was in the storage unit.  And again, we're not saying

14  that number is wrong.  What we're saying is for purposes of

15  determining a variance the Court should recognize just how

16  reasonable a number this is, that there were many other

17  valuations in which the items in that storage unit could have

18  easily been valued at probably over 2 and a half million

19  dollars which would be an extra six points under the

20  guidelines.

21            We didn't pursue sophisticated means under the

22  guidelines which we could have.  There were 49 victims of

23  Mr. Gosman bankruptcy.  Fifty is the magic number under which

24  there is an additional two points.  Had this not been a plea,

25  I would expect that our investigation would have continued

```
 1    and we would have found the fiftieth victim.  That would have
 2    been another two points.  We could have been looking at an
 3    additional ten points; 108 to 135 months.
 4          Instead, we're coming to the Court saying this
 5    guideline sentence of 37 months for three separate crimes --
 6    the mortgage fraud, again, that's not really included because
 7    there's not really a loss associated with that.  But really
 8    for the tax crime and for the bankruptcy crime 37 months is a
 9    reasonable sentence.  And this is the sentence that we
10    believe meets the needs of 3553 of reflecting the seriousness
11    of the offense, promoting respect for the law, affording
12    adequate deterrence, and providing just punishment.
13          THE COURT:  All right.  Mr. Bierman, any response?
14          MR. SHOHAT:  Thank you for just a couple minutes,
15    and that's all I'm going to take, Judge, is just a couple of
16    minutes here because I think we've been beating this thing
17    around long enough in two proceedings.
18          It just strikes me, your Honor, that the
19    Government, with all due respect, has lost sight and
20    perspective of what happened here.  I understand the
21    Government's desire to punish as being the only element of a
22    sentencing and that a prison sentence is the only thing that
23    really counts in the eyes of the Government, but inherent in
24    the suggestion that alternative sentences available to a
25    Court under these circumstance when you look at the whole
```

1    picture of Lin Gosman don't count for anything is almost --

2    it's almost an insulting suggestion.  To say that somebody

3    after everything Lin Gosman has gone through, the nine years

4    of crushing fear, according to the doctor, that she has lived

5    under that has literally destroyed everything about her, to

6    put her now in a position to start to recover without sending

7    her into a prison environment, it's insulting because the

8    statutory scheme puts that in as one of coequal factors,

9    seven coequal factors in this scheme -- in this matrix that

10   your Honor has under consideration.

11        And everything that the Government suggests is that

12   we, the Government, decided that these other figures might

13   apply if we chose to press it and, therefore, you should

14   consider that to avoid giving her a variance.  It's a

15   fallacious argument because none of that has been factually

16   determined.  None of that has been factually presented.

17   That's their argument.  They gave that up in plea

18   negotiations to whatever extent it counted.

19        Your Honor, they opened their presentation with a

20   photograph of that house, a magnificent house.  And I counted

21   at least seven times in her presentation between last hearing

22   and this hearing where she said how spectacular that house is

23   and how wonderful their life was.

24        Lin Gosman came to this marriage as a simple

25   individual, hard-working individual who married very well.

1   This is not about sentencing a formerly wealthy person and

2   sending a message to the community that this is what happens

3   to wealthy people, although that's been a theme throughout

4   this presentation.

5           One thing that strikes me very, very clearly, and I

6   don't know whether the Court is stricken by it, is their

7   whole presentation here is that this is what a bankruptcy

8   judge found, Mrs. Gosman violated those orders, which she has

9   confessed to and admitted to and owned up to, but everything

10   the bankruptcy judge found is true and gospel.  $66 million

11   judgment against her that she attempted to survive against,

12   and that's what she did, that's the error she made, but

13   everything inherent in that judgment is true and gospel, and

14   you should take it as this whole matrix of everything she did

15   and everything that was evil about her.  But yet at the end

16   of the day all this information that went into that, this

17   judgment, these decisions they gave up.

18           If they really felt, with all of these 20 creditors

19   out there that had all of these ten of millions of dollars

20   owed to them, that those judgments and orders were sacrosanct

21   and completely defendable in an appellate context and that

22   all of these creditors out there, why did they settle it?

23   Why did they let Lin Gosman and Abe Gosman walk away?  And

24   actually gave them $5 million back.  Gave them credit for

25   their Homestead exemption.  Took money out of the estate and

1   gave it back to them.  That makes no sense.  It absolutely

2   makes no sense.  And it strongly suggests that the entire

3   underpinning of this proceeding is just more of the same.

4   It's a continued vicious attack on a woman who has made and

5   had admitted to her errors.

6           Now, yes, you have to take all of those factors

7   into account, Judge, every single one of them.  But is it

8   really necessary at this point to say to the community at

9   large, if that's the crucial factor as the Government says,

10  that this woman has to serve prison time after everything

11  that has happened to her?  Would anybody in this world in a

12  general deterrent sense change seats with Lin Gosman?  Is

13  there anymore general deterrence that's needed than what has

14  already happened to this woman?  Ridiculous and not true.

15          All we are asking you to do, and we know how

16  difficult this decision is for you, is to take everything

17  into account, everything including the nine years of fear

18  that Lin Gosman has lived under, of every time she stands in

19  a courtroom and she was dragged into that courtroom

20  repeatedly, every time she picks up the newspaper she reads

21  that her mistakes has caused her to be called a thief, a

22  liar, a contemnor, and it is proceeded to this date.

23          Thank you for your time.

24          MS. BELL:  Your Honor, I'm reminded that under the

25  Crime Victims Rights Act the victim has a right to make a

1    statement.  I've been informed that he would like to.

2            THE COURT:  All right.

3                        MARK BLOOM, SWORN

4            THE COURTROOM DEPUTY:  Please state your name for

5    the record.

6            MR. BLOOM:  Mark Bloom.

7            Your Honor, I'm happy to be sworn.

8            THE COURT:  You're not the trustee.

9            MR. BLOOM:  I am not.  I'm happy to be sworn.

10           THE COURT:  You're an attorney, right?

11           MR. BLOOM:  That's correct.  Mr. Luzinski will

12   speak with the Court's permission in just a moment.

13           THE COURT:  Well, you're just another attorney

14   here.  I think if anybody -- there are supposedly 49 victims.

15   Apparently he represents the victims.  I think I ought to

16   hear from him.  I don't need to hear from another attorney.

17           MR. BLOOM:  That's fine, your Honor.

18           THE COURT:  Thank you.  I will hear from the

19   trustee.

20           MR. LUZINSKI:  Good morning, your Honor.  Joseph

21   Luzinski.  Do you wish me to be sworn?  I'm happy to do that.

22           THE COURT:  Yes, swear him in, please.

23                    JOSEPH J. LUZINSKI, SWORN

24           THE COURTROOM DEPUTY:  Please state your name for

25   the record.

1              MR. LUZINSKI:   Joseph J. Luzinski.

2          Your Honor, it's -- I appear frequently in

3    bankruptcy courts and in state courts as a restructuring

4    work-out person.  I spent a fair amount of time in the

5    courts, but I don't spend time in courts in criminal matters.

6    This is far off the beaten track from where I find myself.  I

7    take no position on the criminal proceedings today and I only

8    make a statement on behalf of the economic interests of the

9    creditors that I represent, and I wish to make a brief

10   presentation on some of the facts that I believe are

11   pertinent for purposes of that case.

12         I in this case act as a fiduciary.  I have acted in

13   many cases both in the Southern District of Florida and other

14   jurisdictions around the country as a Chapter 11 trustee, as

15   a Chapter 7 trustee, as a receiver, and as an assetee, and in

16   fiduciary capacities in both private and public companies.  I

17   view myself as an officer of the court and take that very,

18   very highly.  I am not an attorney.  I am an accountant by

19   education and training.  And I have been in the work-out

20   business for a number of years, and I view myself as a

21   business person, not as an accountant, not as an attorney.

22         Creditors in this estate are owed approximately $80

23   million and they are not widows and orphans but sophisticated

24   banks and lending institutions that over the course of time

25   loaned Mr. Gosman money or provided goods and services to

1    Mr. Gosman.  These cases are of an economic nature, not of a

2    personal nature for me.

3            As a Chapter 7 trustee the duties are to liquidate

4    assets, investigate claims, pursue settlement, distribute

5    funds.  This case has gone on for many years, and I have

6    accomplished most of those tasks over the period of time.

7    The biggest distinction here is in some cases where

8    litigation is involved, these actions take longer.  And it's

9    not by any cause of the parties.  Sometimes it's a systemic

10   scheduling issue, sometimes it is a due process issue,

11   discovery issue, and so forth.  And this case has had many

12   very complex issues.  And it has taken a sufficient amount of

13   time to vet through those issues both from a bankruptcy

14   perspective and from an economic perspective.

15           Over the course of this matter Mr. and Mrs. Gosman

16   had been advised pre-bankruptcy and post-bankruptcy by

17   advisers, by accountants, by lawyers, by individual lawyers

18   for Mr. Gosman and Mrs. Gosman.  They have retained the

19   services that I'm aware of through discovery pre-petition of

20   various asset protection lawyers, various bankruptcy

21   attorneys, and have been in my opinion very well schooled in

22   bankruptcy law and what they might or should do in respect to

23   that.

24           I do note for the record that two times in this

25   case we have sought and gotten crime fraud exemptions to get

1   records from attorneys that previously represented

2   Mrs. Gosman and did that with the full vetting of bankruptcy

3   court orders and in camera reviews of various notes and

4   records from these attorneys in respect of some of the

5   litigations that we have pursued.

6            I would like to touch a little bit on the costs of

7   this estate.  As the estate first rolled into my control,

8   assets were noted of approximately $80 million.  Over the

9   course of this case we have liquidated approximately

10  $114 million worth of assets.  $60 million has been paid to

11  secured creditors.  A distribution was made two years ago of

12  $22 million to unsecured creditors.  Thereafter we have

13  incurred $13 million of professional fees in this case.  The

14  numbers that were discussed earlier of $22 million are

15  factually inaccurate.  There have been other administration

16  expenses incurred in this estate, including the carrying

17  costs associated with the Gosman residence which at the time

18  was costing approximately $150,000 a month.  There have been

19  other costs associated with operating various other assets of

20  the estate.  So there are administration expenses, but those

21  should not be confused with professional fees.

22           The case still pends in the bankruptcy court in

23  West Palm Beach.  We are within a month or two of preparing

24  and filing the final report, and we made a business decision

25  to keep this case open pending outcome of the restitution

1    hearing because the time line was so short.  If there were

2    restitution to be granted, we believed it was worth keeping

3    the case open.  If restitution should not be granted, then

4    the case will be closed.  And we are on track to do that by

5    the end of this year.

6         Some comments were made about records.  Over the

7    course of time with some of the break orders that we sought

8    and received and in consultation with the US Marshal Service

9    we did seize some records.  We immediately went back to the

10   bankruptcy court and sought relief to look at these records.

11   The Court declined that relief and appointed a special master

12   to review the records.  Upon the special master's review and

13   recommendation, in which the bankruptcy court appointed a

14   Miami-based bankruptcy attorney to be the special master,

15   these records were returned to Mrs. Gosman.  I am not aware

16   of any records that I would have in my possession that would

17   be the actual original records from Mrs. Gosman.  We have

18   dozens if not hundreds of boxes of records that have been

19   gotten over the course of this case through discovery, and I

20   am not aware of any original records that are in our

21   possession nor am I aware of any pending requests from

22   Mrs. Gosman's counsel or advisers or tax accountants

23   requesting any information from us in order to assist her in

24   preparation of any schedules or tax returns.

25        Settlement is an interesting concept in bankruptcy

1    matters.  I recall one of the first meetings I had with

2    Mr. Gosman post-bankruptcy, post my involvement in the

3    bankruptcy, which was July of 2002, we had a meeting at the

4    lawyer's office and we discussed settlement on day one.  Over

5    the course of this case we had had settlement discussions

6    many, many times.  These settlement discussions included

7    counseling for Mrs. Gosman.  These settlement discussions

8    included various mediations in front of a well-known Dade

9    County Judge, Herbert Stettin, who mediated these cases for

10   us to attempt to come to a conclusion and not continue with

11   what in hindsight now appears to be very costly and expensive

12   litigation.

13           There were two primary issues in my opinion in this

14   case that were of very significant importance; the marriage

15   issue and the Homestead issue.  And they're all somewhat tied

16   up in the tenancy by the entireties.  And pardon me for not

17   arguing -- I don't intend to argue this case.  I intend to

18   give you my opinion on the facts.

19           The facts are the Homestead is relatively ironclad.

20   Any party is entitled to a Homestead, and we provided a $5

21   million payment from the estate to Mr. Gosman in settlement

22   of his Homestead after extensive settlement discussions,

23   expert witness reports, preparation for trial.  Again, I made

24   an economic decision that that settlement was in the best

25   interest of the estate and that we not litigate this matter

1  for many more years.  In no way, shape, or form in my opinion

2  was that settlement an admission of anything we did or didn't

3  do prior to that.

4         Mrs. Gosman was tied in with that settlement by a

5  separate deal between she and Mr. Gosman.  I did not

6  negotiate that settlement directly with Mrs. Gosman.  The

7  bankrupt debtor, Abraham Gosman, and I had a cordial

8  professional relationship.  We agreed to disagree on many

9  issues.  We agreed to fight over a few issues.  But at the

10  end of the day the majority of the litigation in this case

11  was not with Mr. Gosman but it was with Mrs. Gosman because

12  she opted to not resolve the issue and pursue litigation.

13         I take offense to the position that we have been on

14  a witch hunt or that I'm being vilified for pursuing

15  litigation just to run up fees and to tax the estate.  As a

16  business person I make business decisions, and at the time my

17  team of legal advisers gave me information that suggested

18  these were good claims and good causes of action and in my

19  opinion the bankruptcy court, which was the primary venue

20  that we had to work through these issues, gave us orders that

21  we believe supported the facts and the underlying law on

22  those cases.

23         We did not ever intend to suggest that Mr. and

24  Mrs. Gosman were not married.  We, however, are very clear

25  that they did not meet the unities of marriage in order to

 1    have transacted the tenancy by the entirety relationship.

 2    And that is one of the biggest key issues in this case that I

 3    think has been bantered about many, many times.  And, you

 4    know, I as trustee looking at an economic interest and that

 5    was an economic interest that by law we had the right to

 6    pursue to undue that transaction.  We were successful in

 7    doing that.

 8            Thereafter, the post-judgment discovery associated

 9    with the order on Mrs. Gosman's taking a week-long trial,

10    which Mr. Gosman did not take, he opted out of the trial and

11    did not become a defendant, he in effect gave it up, but she

12    did not, she chose to go to trial.  Subsequent to that trial

13    she chose to file numerous appeals.  I did not drag her into

14    court every week.  Many instances her appeals and her motions

15    for rehearing caused us to be in front of the Court many,

16    many times on many basis.  And I do not take credit for

17    dragging her through the mud.

18            I have not been quoted in the media.  I do not make

19    public statements about this case.  My reputation and my

20    standing in the community is important to me as it is to

21    everyone else.  And this is a business transaction for me.  I

22    work on many different matters, and this is but one of them.

23    And I am very pleased to say that my comments to you are

24    coming to an end and, again, I take no position on any

25    criminal issues related to Mr. Gosman -- Mrs. Gosman, excuse

1    me, but I will say that this is a very peculiar issue that I

2    stand here on behalf of the victims, and I appear to stand

3    alone, and neither the Government nor any other office agrees

4    that these creditors are due any restitution.  That's an

5    anomaly.  That's a quirk in the system.  I know not, but I

6    know that my counsel has advised me that the costs associated

7    with us making the referral, which as you heard earlier was

8    made after the bankruptcy judge made his own referral on his

9    own accord, and the costs of that mortgage, if we were

10   sitting there at the closing that day when the refinancing

11   was transacted and we knew about it, we would have said

12   excuse me, please write that check to me, that money belongs

13   to the estate.  We have a valid judgment.  It's not stayed.

14            And, yes, the fees in this case were very

15   expensive.  I think that it's been glossed over, the fact

16   that there have been post judgment discovery, elicited many

17   deposition, many that were canceled, many that were

18   continued.  It elicited many appeals which in my opinion were

19   very frivolous merely just to further hinder and delay the

20   process.

21            And for all of those reasons, Judge, I would

22   respectfully request that you provide the Gosman bankruptcy

23   estate creditors restitution in this matter.

24            Thank you.  And I'm available for any questions

25   should you have any.

```
 1                 THE COURT:  No questions.  Any response to this?

 2                 MR. BIERMAN:  No.

 3                 MS. BELL:  No, your Honor.

 4                 MR. BIERMAN:  No, your Honor.

 5                 MR. LUZINSKI:  Thank you.

 6                 MR. BIERMAN:  Well, I -- no.

 7                 MR. SHOHAT:  Can we have just a minute, Judge?

 8                 THE COURT:  Certainly.

 9            (Pause in Proceedings.)

10                 MR. BIERMAN:  Assuming, your Honor, that that was

11      only his victim's statement and not an argument as to

12      restitution, I believe that issue has been closed.  If it

13      has, I have nothing to say about it.

14                 THE COURT:  All right.  The first thing the Court

15      has to do is determine the proper guideline, and I think by

16      stipulation the parties agreed on the amount.  The probation

17      office said we're not -- and they weren't bound by it, but

18      I'm going to hold the parties to the agreement.  So what is

19      that; 37 to 41?

20                 THE PROBATION OFFICER:  Yes, Judge.

21                 THE COURT:  37 to 41 would be the --

22                 THE PROBATION OFFICER:  37 to 46.

23                 THE COURT:  46.  Excuse me.  All right.

24                 With regard to the issue that I ruled on earlier,

25      there will be no restitution.  I feel the settlement has
```

1    resolved all of that.

2           Then it's the function of the Court to enter a

3    proper and reasonable sentence in this case.  This case is

4    bizarre in many respects.  It has some unusual facts.  I'm

5    sure somebody would like to write a book about it.  But when

6    we get back to the basic elements, there's a charge of false

7    statement, perjury basically which the Government made into a

8    bankruptcy fraud.  They have a right to charge it that way,

9    but basically what we had is she lied in a deposition, and

10   nobody condones that.  That's a serious thing, although I

11   never see these prosecutions for perjury in this Court.

12          With regard to the bankruptcy, it would appear to

13   me that the mortgage company certainly knew about this

14   judgment and the judgment -- somebody ran a clear title on it

15   and it didn't appear of record so -- if it did appear of

16   record, the mortgage would be worthless.  But she should have

17   reported that she had this judgment.  Although there has been

18   some issue as to the timing of the first application, it

19   still required an obligation.

20          I know as a matter of fact that at this time

21   mortgage companies were only looking to one thing; the amount

22   of the loan and the value of the premises.  Obviously they

23   made bad decisions because that kicked off this whole

24   recession by making poor mortgages.

25          The defendant has paid for this mistake to the tune

1    of $350,000 which does not reduce her mortgage.  So that's a

2    factor the Court certainly would consider.

3           With regard to the income tax, failing to indicate

4    that she had money overseas, obviously that's a violation of

5    the law too, and she's paid for that for $350,000 as I

6    recall.  I don't believe there -- anybody has established

7    that there is any tax due.  This, as I see it, was strictly a

8    penalty for not reporting that and so -- and that's a

9    substantial penalty for failing to pay that.

10          Now, what the Court has to do in determining a

11   proper sentence is, first of all, find the proper guideline,

12   which we've done.  The Court is admonished by the supreme

13   court and others by law to impose a sentence sufficient but

14   not greater than necessary to achieve the four purposes of

15   sentencing outlined in Section 3553(a)(2).  And the Court

16   must look to all of the circumstances in the case.

17          The supreme court has said that a guideline

18   sentence is not presumptively reasonable.  We've also been

19   told that you do not need extraordinary circumstances for a

20   variance.  So we'll look at the various factors.  And the

21   first factor is the nature and circumstances of the offense,

22   and the history and characteristics of the defendant.

23          Taking the history and characteristics of the

24   defendant first, we find that she has absolutely no criminal

25   record, that she was a pillar of society, that she -- both in

```
 1    giving money and the use of time and of their home, were very

 2    philanthropic, contributed to many charitable causes, for all

 3    intensive purpose lived an ideal life.  And as somebody said,

 4    she married well.  Of course, you could take the other side

 5    of that.  But for Mr. Gosman's bankruptcy she wouldn't be

 6    involved in this situation.  But she did make mistakes along

 7    the way.  But there's nothing in the nature and the

 8    characteristics, the history and characteristics of the

 9    defendant to indicate that she's a threat to society.  In

10    fact, she's been a real asset to society by all of the

11    charitable acts that they have performed.

12            The nature and circumstances of the offense.  The

13    Government has talked about everything that starts with the

14    bankruptcy.  But when you take this situation where somebody

15    is leading an ideal life with no economic worries and a

16    court, bankruptcy court comes along, invalidates the marriage

17    for bankruptcy purposes, eventually says that everything she

18    owns is subject to their claims where she's not bankrupt,

19    brings her repeatedly into depositions, this is no

20    justification, it is some understanding of what happened, I

21    think that because of the pressures, because of the

22    tremendous change in her circumstances she did things that

23    she wouldn't ordinarily do.  She did them under tremendous

24    mental stress.  And I think that's a factor the Court should

25    consider.  It has affected her health.  It has affected her
```

1   well-being.  These are all factors, along with the factors

2   the Government has pointed out.

3           Obviously, this long nightmare that she went

4   through, some eight or nine years, had an affect on her

5   and -- but she made some poor decisions.  So taking some of

6   these factors into consideration, the Court -- and

7   furthermore, the people who know her best have overwhelmingly

8   endorsed her lifestyle, her past history, her acts of

9   charity.  I haven't heard one person except lawyers say

10  anything negative about her prior to this time.

11          Now, when you are that wealthy, there are a lot of

12  envious people out there who generally resent rich people.

13  And I might say at this point that when I take my -- took my

14  oath for this position, we have to swear to treat rich and

15  poor alike.  Now, I'm sure what they think in something like

16  that is that you treat the poor people as well as you treat

17  the rich people.  The counter of that is you treat the rich

18  people as well as you treat the poor people.  It cuts both

19  ways.

20          And the reason -- I have never seen such aggressive

21  prosecution of drug dealers, of violent persons, of people

22  who -- I've tried some death cases, taking civil rights.  I

23  haven't seen the Government so exercised, so involved, so

24  personally involved in a case in 23 years.  It's just

25  astounding to me to see the lack of objectivity and the total

1   advocacy here that goes beyond anything I've seen in my term

2   of serving as a judge.

3            And so, obviously, attorneys for the defense are

4   going to be passionate.  They're going to advocate also as

5   they have a right to do, but for -- this isn't a case

6   where -- of a major drug dealer.  This isn't a case where

7   somebody's life was taken.  This isn't a case where somebody

8   was brutalized.  This was a business case.  And people who

9   lend money lend money with knowing of certain risks.  I hear

10  there are secured creditors.  Apparently the secured

11  creditors got paid.  Unsecured creditors, unsecured creditors

12  are always taking a risk.  And it's just like the credit card

13  company.  They'll issue credit cards to anybody knowing it's

14  the cost of doing business.

15           So although these people have rights in bankruptcy

16  to pursue assets, it's not like a Bernie Madoff case where

17  somebody was defrauded.  They made a business decision.  They

18  decided to loan money or provide services on credit to

19  Mr. Gosman, and it didn't work out well.  And we've seen this

20  all over this country in the last year or so where General

21  Motors, Chrysler, AIG, banks, some of the -- Citi Group,

22  Wachovia, all of these have made bad decisions, and that's a

23  cost of doing business.  And in most cases the Government

24  came and bailed them out from their bad decisions.  That

25  didn't happen here.  It would be nice if you had a Government

1    to bail you out whenever you made a bad economic decision,

2    but the Government only does that when you've too big to

3    fail.  So these are factors here.

4         This was a business transaction.  I don't see

5    anything insidious or corrupt or fraudulent about the fact

6    that Mr. Gosman went bankrupt.  Obviously, he's gone through

7    the bankruptcy.  He hasn't been charged with anything, nor

8    could he be.  The Government has no basis for charging him

9    with anything.

10        Now, what is I think unique in this case, which I

11   can't say that I've seen every bankruptcy case, but usually

12   any conveyances made beyond a certain period of time, I don't

13   know if it's three years or 18 months or something, were

14   always exempt from claims of creditors.  Certainly a person's

15   independent property was exempt from creditors.  And I'm sure

16   there must have been some good reason that a $66 million

17   judgment was entered against Lin Gosman who was not a party

18   to this business.  But I can understand how somebody in her

19   position would begin to think that the legal system is

20   failing and that she would be desperately trying to protect

21   her own assets against claims of creditors.  She did it in an

22   improper way, in an illegal way and immoral way, but she did

23   it.  But I can understand how all of this could happen.

24        As Dr. Alexander said, and as attorney LaSorte

25   said, this had devastating emotional and physical

1    consequences to her.  She probably wasn't thinking right.

2    That's not a total defense, but it is factor to be considered

3    by the Court in this matter.

4         Going onto the next factor, the need for the

5    sentence imposed.  Generally, the need is to first of all

6    address the respect for the law.  That is a factor.  The need

7    to punish the person.  That is a factor.  The need to make a

8    statement to society, to the world at large what is

9    acceptable or unacceptable conduct.  That is a factor.  If a

10   person is a danger to the community, that's a factor.  So the

11   question is the need for the sentence involved here.

12        I often reflect on the difference between state

13   court and federal court.  I mean, in state court this case

14   wouldn't go anywhere because they've got prisons full and

15   they say if we put somebody in, we have to let somebody out.

16   Somebody coming out will be worse.  But in federal court

17   there seems to be a general thinking, although I think it's

18   being revised, that everybody should go to jail, everybody

19   should go to jail.  You commit an offense, send them to jail.

20   That's not what I'm hearing in recent cases.  So let's look

21   at some of these factors.

22        The Government has gotten more publicity out of

23   this case than probably 150 other drug cases that never get

24   reported.  So with respect to showing to the community

25   respect for the law, I think they've gotten their money's

1   worth out of this case.  They have said to the community you

2   don't lie under oath, you don't lie to a mortgage company,

3   and you don't lie to the IRS.  And I think people know that.

4   But a lot of it is done.  I see it all the time here.  It's

5   done every day, and with very few circumstances.  And here is

6   where the equal -- equality comes in.

7          The small people never get prosecuted.  It's only

8   the rich people.  The big cases that's going to get the

9   newspapers and television, that's the cases they go after.

10  And that's why the Government -- the Government says we have

11  limited resources, we can't pursue all of these things.

12  Well, they certainly haven't withheld any resources here.

13  Here's the first book I got.  You know, I've never seen

14  anything like this in a sentencing hearing.  And they say,

15  oh, wait.  We have an amendment to the book and here's

16  furthermore exhibits.  So the Government has gotten

17  everything they could out of there.  We have two prosecutors

18  here and spent -- filed numerous memoranda, although not once

19  have they indicated a willingness to defend the claim for

20  forfeiture.  So I think that we have really made a statement

21  to the community at large, to the public at large that this

22  conduct is not to be accepted.

23          And furthermore, at least as to the tax count and

24  to the mortgage count, over -- or $700,000 have already been

25  fined, fines that this Court doesn't see any need to issue a

1    fine on because the Government has already taken that into

2    consideration in the deal.

3           I'm looking at victims now.  With regard to the

4    false statement made in the depositions, all of those assets

5    have been recovered and more.  They've even recovered assets

6    that they wouldn't be entitled to, that were her own

7    property.

8           With regard to the mortgage company, they're not a

9    victim.  They haven't lost anything.  They have a current

10   mortgage, and it's being paid regularly.  And there's a lot

11   of mortgage companies that would die for mortgages like that

12   that are paid regularly and on time.

13          And as far as the federal government and Internal

14   Revenue Service, they haven't lost anything at this point.

15   They got a $350,000 penalty, and it remains to be seen

16   whether additional taxes are owed.  So, the consequences to

17   victims is marginal.

18          The bankruptcy court or bankruptcy trustee argues

19   that additional attorneys' fees were required.  I've looked

20   at a lot of the bankruptcy -- first of all, it's amazing to

21   me, and maybe that's a compliment to the trustee, that they

22   would go back and challenge the marriage.  I mean, how many

23   times has that ever been done, to go back and find out and

24   try to challenge somebody's marriage.  That's incredible.

25   And without challenging the marriage apparently they wouldn't

1   have a basis for any of these transfers.

2          Now, I asked the Government at the last hearing if

3   the marriage were valid, would these be preferential

4   transfers.  She said I can't answer that question.  You'll

5   have to ask the trustee.  So I assume that they would have

6   been valid, although I don't know what the law is if a

7   husband owns property and he goes bankrupt and he transfers

8   to his wife within a certain period.  That still might be a

9   preferential transfer.  I don't know.  But I'm sure that

10  setting aside the marriage was a big factor in saying there's

11  no tenancy by the entireties.  And, you know, I don't know

12  when these items were transferred.  But the engagement ring,

13  obviously that was transferred at the time they got engaged.

14  But she ended up with a $66 million judgment.  So virtually

15  every asset she owns is now subject to that judgment.

16          And it's interesting, the trustee had no desire to

17  have some other Court review that.  They agreed to set aside

18  that judgment.  And not only that, they paid $5 million back

19  for the Homestead.  Homestead, of course, is always a big

20  issue.  So they got what they wanted out of that judgment and

21  now the judgment is set aside.  It's interesting.

22          It's interesting that they tried to get their money

23  repatriated.  The bankruptcy judge wouldn't do that.  So the

24  way to get it repatriated is charge her with a crime, put her

25  in jail saying she can't have bond because she's got money

1   overseas, and she gets out of jail by repatriating the money.

2   So there's just a lot of factors here.

3   But we're talking about the need for the sentence.

4   And I think the Government's gotten a lot of mileage out of

5   the publicity, people know about this case, and I am

6   concerned about her health, both psychiatric -- psychological

7   and physical, and I have to weigh that in determining a

8   proper variance.

9   The kinds of sentences available.  Well, again we

10  get back to the premise that the Court shall impose a

11  sentence sufficient but not greater than necessary to comply

12  with the purposes set forth in this subsection.

13  The past eight or nine years have been penalties

14  beyond what anybody could know just being in jail.  I think I

15  have to weigh that factor of the horror that they've gone

16  through.  And I see the way the attorneys treat her.  They

17  call her a lie, a cheat, and contempt of court.  The trustee

18  didn't do that, but certainly his lawyers did.  And to go

19  through that for all of these years is a substantial penalty.

20  Factors four and five, the advisory sentencing

21  guidelines and policy sentences.  I do find that under 5K2.20

22  this is aberrant conduct.  Usually aberrant conduct is a

23  result of one incident.  This is three incidents which are

24  before the Court but all arising out of a tremendous

25  situation.  Your marriage is invalid.  You lose your house.

1    You lose your clothes.  They're going to sell at auction all

2    of your clothes and your jewelry.  I mean, I think this was a

3    unified reaction to very multiple manifestations of the

4    attempt to seize assets that she thought were legitimately

5    her own.  And so that's certainly a factor to be considered.

6    Again, all of the people who know her best say that it's

7    inconsistent with the way she has lived her life up to this

8    point.

9          Another factor is avoiding disparity with similar

10   offenders.  Not only -- if the basic idea is fraud and

11   transfer, then Mr. Gosman transferred it also.  I think he

12   believed his marriage to be valid and he did it with the

13   proper -- we know that any transfer between husband and wife

14   is tax-exempt and you can do those things and most people

15   handle things by a tenancy by entirety, but compare this with

16   other offenders who may be charged with perjury, may be

17   charged with bankruptcy or fraud.  You know, this is not the

18   bankruptcy fraud we usually see.  This is just not telling

19   that there's a judgment against you.  And that's the mortgage

20   company's job to make sure they got clear title, and they did

21   get clear title and they're not a victim and they haven't

22   lost anything.

23         And also with regard to the IRS, as they tell me

24   now there are 19,000 people just with UBS who have accounts

25   overseas.  And I'm sure they're not reporting to the

1   Government.  And they're all going to be offered amnesty if

2   they just come forward and admit it.  So I think that this

3   case will have a lot of repercussions on those people who are

4   deciding whether they're going to report now these facts.

5           So taking all of these factors into consideration,

6   I think it overwhelmingly points to a variance.  This is not

7   the type of case where people are violent, people who commit

8   serious violent crimes or drug offenses which put many people

9   into addiction.  So the Court will depart.

10          And again, the question then becomes is a sentence

11  of imprisonment required here.  And in my opinion I don't see

12  what imprisonment is going to do to make this situation any

13  better or any -- for anybody.  There are vindictive people,

14  small-minded people who love to see wealthy people persecuted

15  and lose their wealth and their position.  And this probably

16  won't be popular with a lot of people, but I haven't heard a

17  single word from anybody saying, other than attorneys, that

18  she ought to go to jail.  Everyone has said she doesn't

19  belong in jail.  This is not the type of person that you put

20  in jail for this offense.  And I think that under the

21  guidelines as they now apply that the Court has discretion to

22  fashion a sentence that will not require a jail time.

23          So the Court has considered the statements of all

24  parties, the presentence report which contains the advisory

25  guidelines, the statutory factors, and finds that the

1    defendant is not able to pay a fine as well as -- a fine

2    under these circumstances as she's already paid substantial

3    fines to the tune of $700,000.

4            It's the judgment of the Court that the defendant,

5    Linda Castre Gosman, is sentenced to time served as to Counts

6    1 and 7 of Docket No. 08-80134, and time served as to Count 1

7    in Docket No. 08-80041.  All to be served concurrently.

8            She will be placed on supervised release for a

9    period of three years.  During the time of her supervised

10   release she will spend two years under house arrest with the

11   usual monitoring conditions.  She will be able to go out to

12   work or do charitable work, but under the same conditions

13   that she's been placed up until this time.

14           She will also be subject to community service for

15   1,000 hours spread over that three-year period.

16           I have so many papers in this case it's hard to

17   keep track of everything.

18           While she is under supervised release she will be

19   subject to the usual terms of supervised release, standard

20   conditions, and the following special conditions of

21   supervision:

22           The defendant shall cooperate fully with the

23   Internal Revenue Service in determining and paying any tax

24   liabilities.

25           The defendant shall provide to the Internal Revenue

1    Service all requested documents and information for purposes

2    of any civil audits, examinations, collections, or other

3    proceedings.

4          It's further ordered the defendant shall file

5    accurate income tax returns and pay all taxes, interest, and

6    penalties due and owing by her to the Internal Revenue

7    Service.

8          The defendant shall provide complete access to

9    financial information, including disclosure of all business

10   and personal finances, to the US Probation Officer.

11         The defendant shall obtain prior written approval

12   before -- from the Court before entering into any

13   self-employment.

14         The defendant shall submit to a search of her

15   person or property conducted in a reasonable manner and at

16   reasonable times by the US Probation Officer.

17         The defendant shall immediately pay a special

18   assessment in the amount of $300, which includes Counts 1 and

19   2 in case 80134 and Count 1 in case 041.

20         Forfeiture of defendant's right, title, and

21   interest is hereby ordered consistent with the plea

22   agreement.  Maybe that's already been done.  I don't know.

23   The United States shall submit proposed order of forfeiture

24   within a week of this proceeding.

25         Now that sentence has been imposed, does the

1    defendant or her counsel object to the Court's findings of

2    fact or the manner in which sentence was pronounced?

3              MR. SHOHAT:  No, your Honor.

4              THE COURT:  And I won't ask you.

5              MS. BELL:  I just need to talk about the forfeiture

6    for one second.

7              THE COURT:  Pardon?

8              MS. BELL:  I have language relating to the

9    forfeiture.

10             THE COURT:  Okay.

11             MS. BELL:  The preliminary order of forfeiture

12   entered by this Court on April 10th, 2009, Docket Entry 62,

13   is incorporated into this judgment and commitment.  That's

14   the language that we would suggest to the Court with respect

15   to the forfeiture.

16             THE COURT:  All right.  We'll put that language in

17   the J and C.

18             You understand that you have a right to appeal the

19   sentence imposed.  Any notice of appeal must be filed within

20   ten days after the entry of the judgment.  If you are unable

21   to pay the cost of appeal, you may apply for leave to appeal

22   without payment of cost.

23             Do you understand that?

24             THE DEFENDANT:  Yes, your Honor.

25             THE COURT:  All right.  Anything further?

1          MR. BIERMAN:  Yes, your Honor.  Two very brief

2     things.  One, I would ask the Court to suggest that the

3     forfeiture or a portion of it be paid to Washington Mutual to

4     reduce the mortgage in light of the collapse of the real

5     estate market.  And secondly, I would ask the Court to

6     exonerate the bond because there's no --

7          THE COURT:  Well, I don't know.  Do I have the

8     jurisdiction to say where the forfeiture goes?  Forfeiture is

9     generally to the Government.

10          MR. BIERMAN:  It is.

11          THE COURT:  If the Government wants to take care of

12     the mortgage company or they just want to pad their pockets

13     with it, that's up to them.

14          MR. BIERMAN:  I was just asking for a

15     recommendation.

16          THE COURT:  Well, I would think that the money

17     ought to go to pay off the mortgage.  But, obviously, the

18     Government doesn't see it that way.  They see it as a penalty

19     or a fine.

20          MR. BIERMAN:  And then just, secondly, we'll submit

21     an order exonerating the bond if that's agreeable.

22          THE COURT:  That's agreeable.

23          MS. BELL:  Your Honor, we would also -- we would

24     move to dismiss the remaining counts of the indictment.

25          And not surprisingly, we would object to the

1    Court's variance in this case.  And for the record, we

2    believe that there is no basis for a variance in this case

3    and that the reasons that the Court suggested are not

4    appropriate grounds for a variance.

5            THE COURT:  I'm not surprised.

6            MS. BELL:  I know.

7            THE COURT:  All right.  Anything further?

8            MR. SHOHAT:  No.

9            THE COURT:  Thank you.  Court will be in recess.

10        (Proceedings concluded at 11:39 a.m.)

```
 1                         I N D E X

 2    WITNESS                                          PAGE

 3    STANLEY I. FOODMAN, DEFENDANT'S WITNESS, SWORN ...........60
      DIRECT EXAMINATION BY MR. BIERMAN ........................60
 4    CROSS-EXAMINATION BY MS. BELL ............................69
      REDIRECT EXAMINATION BY MR. BIERMAN ......................77
 5
      MARK BLOOM, SWORN ........................................95
 6
      JOSEPH J. LUZINSKI, SWORN ................................95
 7

 8                 *       *       *       *       *

 9

10                    C E R T I F I C A T E

11        I, Karl Shires, Registered Professional Reporter, certify

12    that the foregoing is a correct transcript from the record of

13    proceedings in the above-entitled matter.

14        Dated this 24th day of September, 2009.

15

16    _____
      Karl Shires, RPR
17

18

19

20

21

22

23

24

25
```